**Michael GADDIS, et al., Plaintiffs,**

v.

**Donal CAMPBELL, Commissioner of the Alabama Department of Corrections, Defendant.**

No. CIV.A. 03–T–390–N.

United States District Court,
M.D. Alabama,
Northern Division.

Feb. 4, 2004.

**1311**

Rhonda Brownstein, Danielle Jeannine Lipow, Gabriel Grace Graham, Kelley McNair Bruner, Montgomery, AL, for Michael Gaddis, Manson Fisher, Jr., aka Yusuf Rahim, Robert William Hamilton, Cedric McLain, Louis Jenkins, James Taylor, plaintiffs.

William F. Addison, Andrew W. Redd, Jane LeCroy Brannan, Asst.Gen.Counsel, Alabama Department of Corrections, Legal Division, Montgomery, for Donal Campbell, Commissioner of the Alabama Department of Corrections, defendant.

## OPINION

Myron H. THOMPSON, District Judge.

In this class-action lawsuit, diabetic inmates in the Alabama Prison System brought suit against the Commissioner of the Alabama Department of Corrections, alleging Eighth Amendment violations in the Corrections Department's treatment of their disease. Jurisdiction is proper under 28 U.S.C.A. §§ 1331 and 1343(a)(4). This case is now before the court on the parties' joint motion to approve a settlement agreement. The court held a fairness hearing on January 15, 2004, at which it took testimony about the proposed settlement. Based on a careful consideration of the joint motion and the objections to it, the court orally stated that it would grant the motion, and promised that a written opinion would follow. This is the promised opinion.

## I. BACKGROUND

The plaintiffs in this case are Alabama prison inmates who suffer from diabetes mellitus, a complex, chronic illness with disabling long-term consequences. They name only one defendant: the Commissioner of the Alabama Department of Corrections. The plaintiffs' lawsuit alleged that, in violation of the Eighth Amendment to the United States Constitution as enforced through 42 U.S.C.A. § 1983, Alabama prisoners with diabetes were at serious risk of substantial harm, and even death, as the result of the inadequate med-

ical care that the Department of Corrections provided them. Specifically, the plaintiffs alleged that they had suffered blurred vision, diabetic retinopathy, amputations of the toes, possible kidney damage, recurrent hypoglycemia (low blood sugar), dizziness, and pain. The lack of treatment also exposed the plaintiffs to the risk of blindness, amputations of feet and legs, kidney failure, nerve damage, pneumonia, strokes, heart attack, and death.

Upon an unopposed motion for class certification filed pursuant to Fed.R.Civ.P. 23, this court certified a class of "all present and future inmates with diabetes who are or will be incarcerated" in a Corrections Department facility. The parties entered into settlement discussions almost immediately after the suit was filed, and came to a settlement agreement shortly thereafter.

## II. TERMS OF THE SETTLEMENT AGREEMENT

The parties' proposed settlement agreement would mandate many changes in the medical care provided to inmates with diabetes. Among these changes are the following:

(1) All incoming Corrections Department inmates will be screened to ensure that those who are already diagnosed as diabetic are treated immediately, and those who may be diabetic but have not been diagnosed are identified.

(2) All diabetic inmates on insulin will have the opportunity to have their blood sugar measured twice daily by finger stick, prior to each insulin dose, and to have their insulin adjusted based on the blood-sugar result.

(3) Baseline glycated hemoglobin (HbAlC) will be measured as a baseline at intake and every three or six months thereafter.

(4) Diabetic inmates who are compliant with their treatment, but who have inadequate blood sugar control despite routine interventions by facility professional staff, will be referred to diabetes specialists for consultation and management.

(5) Diabetic inmates will receive regular preventative examinations to screen for complications of diabetes, such as annual dilated-retinal examinations, annual testing for kidney disease, regular foot exams with monofilament, regular testing and treatment for heart disease, annual dental cleaning, annual immunization against influenza (for insulin-dependent inmates), and immunization against pneumonia (for insulin-dependent inmates).

(6) All diabetic inmates will be offered a full physical examination by a physician/nurse practitioner annually, and will be enrolled in a regularly scheduled chronic-disease clinic staffed by professionals with training and expertise in the management of diabetes, and which will follow detailed written protocols for routine assessment and care.

(7) Diabetic inmates with numbness, pain, indigestion, dizziness, or other symptoms related to nerve damage will be offered necessary treatment and, when medically necessary, referral to appropriate specialists.

(8) Diabetic inmates will be given the opportunity for daily large-muscle exercise.

(9) The Department of Corrections menu for diabetic inmates will be revised to be in accordance with the most current standards for diabetic diets as promulgated by the American Diabetes Association.

(10) The Corrections Department will provide twice-yearly educational and nutritional classes for all diabetic inmates.

(11) Corrections Department security staff will be trained to recognize the symptoms and signs of diabetes.

The settlement agreement will remain in effect for two years, during which time it will be monitored by the Corrections Department's "contract monitor," a medical professional independent of the Department of Corrections who will ensure that the terms of the agreement are met. The settlement will be enforceable in only state court. The plaintiffs waived their claim to attorneys' fees and costs. Finally, the Corrections Department Commissioner stipulated that the named plaintiffs will not be precluded from bringing individual damage actions in the future.

## III. DISCUSSION

Judicial policy favors voluntary settlement of class-action cases. *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977).[1] However, "the settlement process is more susceptible than the adversarial process to certain types of abuse and, as a result, a court has a heavy, independent duty to ensure that the settlement is 'fair, adequate, and reasonable.'" *Paradise v. Wells*, 686 F.Supp. 1442, 1444 (M.D.Ala. 1988) (Thompson, J.); *accord* Fed.R.Civ.P. 23(e)(1)(C) ("The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement is fair, reasonable, and adequate."). Court review is "essential to assure adequate representation of class members who have not participated in shaping the settlement." Fed.R.Civ.P. 23(e) advisory committee's note. In addition to analyzing the fairness of the proposed settlement, the court must assure that it is not illegal or against public policy. *Paradise*, 686 F.Supp. at 1448; *Piambino v. Bailey*, 757 F.2d 1112, 1119 (11th Cir.1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986). The court must also determine whether notice to the class was adequate, Fed.R.Civ.P. 23(e), and must examine the class members' comments and objections, *Paradise*, 686 F.Supp. at 1444, and the judgment of counsel, *id.* at 1446. Because this case involves a challenge to prison conditions, the court must also determine whether the settlement is subject to the requirements of the Prison Litigation Reform Act, 18 U.S.C.A. § 3626, that is, the PLRA, and, if so, whether those requirements have been met.

### A. Prison Litigation Reform Act

The PLRA strictly limits the prospective relief a federal court may order in cases concerning prison conditions.[2] However, these limitations do not apply to "private settlement agreements." 18 U.S.C.A. § 3626(c)(2)(A); *Austin v. Hopper*, 15 F.Supp.2d 1210, 1218 (M.D.Ala.1998) (Thompson, J.). A "private settlement

---

1. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

2. The PLRA limits the prospective relief a federal court may order in cases concerning prison conditions. Prospective relief may "extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs," and must be "narrowly drawn," and "the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C.A. § 3626(a)(1)(A).

The PLRA also limits the ability of a federal court to order prospective relief that "requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law" unless federal law permits such relief, the relief is necessary to correct the violation of a federal right, and no other relief would correct the violation. § 3626(a)(1)(B). In addition to limiting the type of relief a federal court may grant, the PLRA also limits such relief to two years after the court approves or grants the relief, or one year after the court has entered an order denying termination of relief. § 3626(b)(1).

agreement" is defined in the PLRA as "an agreement entered into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled." 18 U.S.C.A. § 3626(g)(6). In addition, the PLRA provides that a party to a private settlement agreement claiming that the agreement has been breached is not precluded "from seeking in State court any remedy available under State law." § 3626(c)(2)(B).

■ The parties chose to resolve their lawsuit through a private settlement agreement, rather than through a judicially enforceable consent decree. The proposed agreement contemplates enforcement through the mechanisms permitted by the PLRA: reinstatement of the action and state-court relief. In agreeing to this, the plaintiffs have avoided the PLRA's stringent limitations on the type of relief available. The expense of their trade-off is the relinquishment of their right to obtain a court order that is enforceable in federal court.

### B. Class Notice

■ Rule 23(e) of the Federal Rules of Civil Procedure requires that the court ensure that all interested parties are informed of the settlement of a class-action case and have the opportunity to voice their objections. Accordingly, a court-approved notice was conspicuously posted on community bulletin boards in every dormitory in every Corrections Department prison, as well as in the law libraries and dining areas of each facility. The notice was also served individually on each inmate in segregation. The notice advised that the parties in this diabetes case had

agreed to settle the case, and explained the provisions of the proposed settlement. In plain and simple language, the notice highlighted the fact that inmates had a right to object to the settlement, and provided the name and address of the court clerk to whom objections should be mailed. The notice also included copies of a form on which objections could be made.

The adequacy of the notice is reflected, in part, by the substantial number of written responses filed. A total of 49 objections to the agreement were filed by members of the plaintiff class. The court concludes that these measures were sufficient to satisfy the notice requirement of Rule 23(e).

### C. Class Members' Objections and Comments

■ As stated above, 49 objections were filed in opposition to the settlement agreement.[3] While the large majority of class members did not file objections, the court does not interpret the silence from the remaining class members as indicating their agreement with the terms of the settlement.[4] As this court has previously noted, "the court must look beyond the numbers to the total reality of the circumstances presented and from those circumstances attempt to extrapolate some picture of the true support for the [settlement]." *Reynolds v. King,* 790 F.Supp. 1101, 1109 (M.D.Ala.1990) (Thompson, J.). The court is "especially wary of such silence in the context of prison litigation where the members of the class are likely to have lower literacy levels." *Austin,* 15 F.Supp.2d at 1222–1223. The court must therefore take pains to examine the objections that are raised to determine wheth-

---

3. One objection form had attached to it 34 other blank objection forms signed by diabetic inmates. Since the blank forms did not state any basis for an objection, the court treats this as just one objection.

4. The plaintiffs' uncontested motion for class certification approximated that there are 1,360 inmates with diabetes in the Alabama Prison System.

er the agreement is fair, adequate, and reasonable.

Many of the objections filed in this case are based on incorrect information or a lack of understanding of the settlement agreement. For instance, many objectors complain that the settlement agreement lacks provisions that it actually contains, such as a provision allowing inmates to keep on their persons emergency glucose to treat low blood sugar. Several objections contradict what the plaintiffs' medical expert has stated is medically necessary; for instance, six objectors state that the diet and exercise provisions of the settlement are inadequate, but the plaintiffs' expert believes that they are sufficient.

Several inmates object to the lack of monetary damages in the settlement agreement. However, the lawsuit did not seek monetary damages, and none of the named plaintiffs and plaintiff class members is barred from pursuing such relief.

Some of the comments filed predict that the Corrections Department will not actually follow the terms of the settlement. In order to ensure that this will not happen, the agreement provides for monitoring by an independent contract monitor, and for the possibility that the case could be reinstated or that enforcement actions could be brought in state court.

Finally, two inmates object to the fact that the settlement agreement is enforceable only in state court, rather than in federal court. The plaintiffs would undoubtedly prefer to have the option of enforcing the settlement agreement in federal court. However, as explained above, the PLRA means that the plaintiffs could not obtain a judgment which is enforceable in federal court unless this court made explicit findings that the relief was narrowly tailored to remedy a constitutional violation. The plaintiffs made the decision to forgo the risk that, after extensive trial preparation and trial and the delay that would attend both, this trial court or an appellate court might find a federally enforceable judgment unsupported by the evidence and the law, in favor of an immediate settlement that provides all of the relief the plaintiffs sought. After all, "[a] settlement is in large measure a reasoned choice of a certainty over a gamble, the certainty being the settlement and the gamble being the risk that comes with going to trial." *Paradise*, 686 F.Supp. at 1446. Here, the court cannot fault the plaintiffs "want[ing] the certainty." *Id.*

Based on its careful review of the objections filed in this case, the court finds that most of the inmates who objected to the settlement agreement did so based on a misunderstanding of the terms of the agreement, a lack of information about, or a disagreement with, contemporary medical standards for the treatment of diabetes, or a lack of trust in the Corrections Department; these objections did not point to any unfairness in the terms of the settlement agreement itself. The objections to the unavailability of enforcement in federal court are not groundless; however, the plaintiffs' decision to trade enforceability for immediate and substantial relief is a reasonable and defensible choice.

### D. Judgment of Counsel

"In addressing whether a settlement is fair, adequate, and reasonable, a court should also consider the judgment of experienced counsel for the parties." *Paradise*, 686 F.Supp. at 1446. Class counsel have argued that the proposed settlement is fair, adequate, and reasonable, and have thoroughly explained the benefits the settlement agreement provides. Class counsel for the plaintiffs are experienced civil-rights lawyers who have shown the court, through their participation in this and other prisoners' rights cases, their commitment to protecting the rights of the plaintiff class. There has been no suggestion of

any collusion between the parties, or any charge that the negotiations were anything other than at arms' length. Further, class counsel agreed to waive attorneys' fees and costs, thus further demonstrating their dedication to the interests of the plaintiff class. *Cf. Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1215–16 (5th Cir.1978) (noting that the court should be sensitive to potential conflict between the class and its attorneys, particularly where large attorneys' fees may be at stake). Accordingly, the plaintiffs' attorneys' views carry great weight with this court.

### E. Assessment of the Joint Motion

"Finally, with the above considerations in mind, the court should itself assess whether the settlement agreement is fair, adequate, and reasonable," *Paradise*, 686 F.Supp. at 1446. As part of its duty to examine the fairness of the proposed settlement and as required by Rule 23(e), the court held a fairness hearing on January 15, 2004. At the hearing, plaintiffs' counsel explained the provisions of the settlement and addressed the objections filed. The Department of Corrections presented the testimony of three witnesses. Ruth Naglech, the Corrections Department's current "contract monitor," testified regarding her method for evaluating the department's compliance with the settlement agreement, and assured the court that she would meet with and interview members of the plaintiff class as part of her evaluation of compliance. Second, the court heard testimony from Dr. Will Mossier, the statewide director of Prison Health Services, the private medical contractor currently providing medical services in all state prison facilities; Dr. Mossier explained various medical aspects of the agreement and assured the court that the medical staff would comply with its terms. Finally, Dr. Ron Cavanaugh, the Corrections Department's Director of Treatment, testified regarding the agreement's screening provisions for new inmates.

Based on the testimony at the fairness hearing, a review of the settlement agreement, and an examination of the entire record in this case, the court finds that the proposed settlement is fair, adequate, and reasonable. The agreement contains all, or almost all, of the relief the plaintiffs sought, and will mean a significant improvement in the treatment of diabetic inmates in state prison facilities. Because the case was settled at an early stage of litigation, the relief will be implemented immediately. Had the parties proceeded to trial, a lengthy, complex proceeding could have resulted, and success would not have been guaranteed. Further, as discussed above, the constraints of the PLRA mean that by agreeing to a private settlement, the parties could agree to complete and immediate relief without the need for a trial or extensive judicial findings.

Finally, the court concludes that the settlement complies with state and federal law, and does not violate public policy.

## III. CONCLUSION

For the foregoing reasons, the court concludes that the settlement agreement reached in this case is fair, adequate, and reasonable. A verbal order granting the parties' joint motion to approve the settlement was entered on January 15, 2004. It is supplemented by the written judgment accompanying this memorandum opinion.

## JUDGMENT

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court as follows:

(1) The objections to the proposed settlement, filed by plaintiff class members in

response to the notice to the class, are overruled.

(2) The joint motion for approval of the settlement agreement, filed November 14, 2003 (Doc. no. 22), is granted.

(3) The revised settlement agreement, filed January 15, 2004 (Doc. no. 50), and which is attached as an appendix to this judgment, is approved.

(4) This lawsuit is dismissed without prejudice.

Furthermore, in order to provide plaintiff class members with notice of the final disposition of this lawsuit, it is ORDERED as follows:

(1) Within 14 days from the date of this order, defendant Commissioner of the Alabama Department of Corrections shall cause to be provided to plaintiff class members, in the same manner that notice of the proposed settlement agreement was provided to them, notice of the final disposition of this lawsuit. Plaintiffs' counsel and defendant Commissioner of the Alabama Department of Corrections shall agree on the content of the notice.

(2) Within 28 days of the date of this order, defendant Commissioner of the Alabama Department of Corrections or his representative shall file with the court a copy of the agreed-upon notice of final disposition, along with a sworn affidavit detailing how said notice was provided to plaintiff class members.

(3) The court retains jurisdiction for 35 days from the date of this order for the limited and only purpose of supervising the provision of the final disposition notice to plaintiff class members, with the court's jurisdiction to terminate after that 35–day period.

It is further ORDERED that the parties are to bear their own costs and attorney's fees.

The clerk of the court is DIRECTED to enter this document on the civil docket as a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

## APPENDIX

## REVISED SETTLEMENT AGREEMENT

WHEREAS on April 9, 2003, plaintiffs filed suit challenging the constitutional adequacy of the medical care provided to persons with diabetes by the Alabama Department of Corrections (ADOC); and

WHEREAS on July 11, 2003, the Court certified a class as consisting of all present and future inmates with diabetes who are or will be incarcerated in an Alabama Department of Corrections facility; and

WHEREAS the plaintiffs and defendant agree that it is in their best interests to resolve this lawsuit;

NOW THEREFORE the parties, by and through their respective counsel, hereby stipulate and agree to the following provisions:

## A. DIABETES POLICIES AND PROCEDURES

1. The defendant will develop written policies and procedures (including nursing protocols) for the management and care of diabetic inmates in the ADOC. These policies and procedures will incorporate the provisions of this Settlement Agreement. Any medical contractor who contracts with the ADOC to provide medical care to ADOC inmates must abide by these policies and procedures. The policies and procedures will be required to be included in the medical contractor's policies and procedures manual. The defendant shall also develop written policies and procedures for the ongoing training of medical and correctional staff in the recognition of emergent diabetic situations. All policies and procedures shall be reviewed annually and updated as necessary to be consistent with

current ADA (American Diabetes Association) Standards. The current ADA Standards for correctional facilities are attached to this Settlement Agreement. The ADOC shall incorporate the relevant terms of this Settlement Agreement in any Request for Proposal for medical care submitted to potential vendors.

## B. INTAKE SCREENING

2. *Reception Screening:* Immediately upon arrival, any inmate who identifies him or herself as an insulin-diabetic shall see a physician within 24 hours to confirm that the inmate needs to be on insulin and, if so, to ensure that the insulin is continued.

3. *Intake Screening:*

(a) Inmates entering the ADOC who are already diagnosed with diabetes shall have a complete medical history and a physical examination consistent with ADA Standards. As part of the required medical history, the defendant shall review the results of any fasting blood sugar measurement taken prior to placement in the ADOC that have been provided. The medical history should focus on the inmate's type of diabetes and, if the inmate is taking insulin, efforts should be made to differentiate between Type–1 diabetes and insulin-requiring Type–2 diabetes, in accordance with ADA Standards. The frequency of ketoacidosis as well as hypoglycemia shall be determined, as well as a history of severe hypoglycemia without awareness (i.e., requiring the assistance of another person). A history of any known chronic complications associated with diabetes, including findings from the last dilated retinal examination, shall be determined.

(b) *Diagnosis of diabetes:* As part of its routine medical screening of all inmates entering the ADOC and as part of its annual physical examination of all inmates, the ADOC shall conduct a random plasma glucose test. If the random plasma glucose test reveals a glucose level of 200 or higher, the inmate will be given a second random plasma glucose test within 48 hours. If the second plasma glucose test also yields a glucose level of 200 or higher, the inmate will be diagnosed with diabetes. If, on the other hand, the second random plasma glucose test yields of glucose level of *less than* 200, the inmate will not be diagnosed with diabetes, but he or she will be given a confirmatory fasting plasma glucose test after the inmate arrives at his or her assigned facility. If the confirmatory fasting plasma glucose test reveals a glucose level of 126 or higher, the inmate will be diagnosed as diabetic.

(c) All diabetic inmates shall, within a medically reasonable period of time, receive a screening laboratory evaluation that shall include baseline laboratory studies consistent with current ADA standards. Currently, this shall include a hemoglobin AIC, HDL-cholesterol, triglycerides, total cholesterol, urine for microalbumin, urinalysis for protein and ketones, serum creatinine, thyroid stimulating hormone (TSH) when indicated, and EKG. A fasting LDL-cholesterol test will be performed at the first chronic care clinic that a diabetic inmate attends after they leave the reception center and are assigned to their permanent facility.

## C. BLOOD SUGAR TESTING AND CONTROL

4. Treatment targets for both blood glucose and glycated hemoglobin shall be individually established for each diabetic inmate. Targets shall be as close as possible to those recommended by ADA Standards.

5. Diabetic inmates, particularly insulin requiring diabetics, shall be afforded the opportunity to have their capillary blood glucose (finger sticks) measured as often

as necessary for adequate diabetes control. Diabetic inmates receiving insulin shall be afforded the opportunity to have their blood sugar (by capillary blood testing) measured prior to each dose (twice per day), with a medically necessary adjustment of the insulin dose based on the blood sugar result obtained at that time. High blood sugar found at other times shall be treated medically, including with an appropriate dose and type of insulin when medically necessary.

6. Diabetic inmates shall have the opportunity to have their baseline glycated hemoglobin (HbA1C) measured as a baseline at intake and every three months thereafter. If their glycolated hemoglobin level is normal, the interval of testing can be advanced to every 6 months. If test results are not in the target range for that patient, the medical staff shall review management to determine if modification is necessary to improve blood sugar control. Their management review shall be documented in the medical record.

7. Diabetic inmates who are compliant with their treatment, but who have inadequate blood sugar control despite routine interventions by facility professional staff, shall be referred to diabetes specialists for consultation and management.

8. Diabetic inmates shall have access to prompt treatment of hypoglycemia, and shall be provided with, or permitted to keep on their persons, glucose tablets and/or appropriate snacks for use whenever they feel symptoms of hypoglycemia. The ADOC shall stock in the medical unit injectable glucagon for emergency treatment of hypoglycemia.

9. Diabetic inmates with high blood sugar and ketosis shall be afforded ready access to health professional staff at any time of the day or night, and provided with urgent medical management in an attempt to prevent dehydration, metabolic acidosis, and coma requiring hospitalization.

## D. EYE EXAMS

10. Diabetic inmates shall be afforded the opportunity to receive an annual dilated retinal examination by an ophthalmologist or optometrist who is knowledgeable and experienced in the screening for diabetic retinopathy, cataracts, and glaucoma. Diabetic inmates found to be suffering from complications of retinopathy, cataracts, and glaucoma shall be referred for timely treatment to an ophthalmologist.

## E. FOOT EXAMS

11. Diabetic inmates shall receive a medically appropriate foot exam with monofilament in accordance with ADA Standards initially and as part of a regularly scheduled and formal chronic care clinic. Diabetic inmates shall be provided appropriate footwear (i.e. shoes that fit and which are able to protect their feet from injury) by the ADOC, including special orthopedic footwear prescribed by a physician or nurse practitioner. Foot disorders shall be treated with timely referral for necessary specialty care, and appropriate follow-up by the facility's professional staff. Nursing procedures ordered by medical providers shall be provided on a schedule and frequency as ordered.

## F. TESTING AND TREATMENT FOR KIDNEY DISEASE

12. Diabetic inmates shall have their urine protein tested annually with a microalbumin test, unless the test has been positive and they are medicated with an ACE inhibitor. Diabetic inmates with proteinuria, microalbuminuria, or other signs of kidney disease shall receive medically appropriate treatment, including ACE inhibitors, when medically indicated.

 

## G. TESTING AND TREATMENT FOR HEART DISEASE

13. Diabetic inmates shall have the opportunity to have their fasting lipid levels tested in accordance with ADA and National Cholesterol Education Project Standards. Persons with high lipid levels shall be treated with appropriate medicine, including statins. Diabetic inmates with high blood pressure, dyslipidemia, and arterial obstruction shall be treated in accordance with ADA Standards for those diseases.

## H. DENTAL CARE

14. Diabetic inmates shall be afforded the opportunity to have a cleaning by a dental practitioner at least once per year. More frequent cleanings shall be provided as medically needed to maintain healthy gums in some patients, and quadrant scaling with hand tools shall be provided as needed to treat established gum disorders.

## I. PREVENTATIVE AND CHRONIC CARE

15. Insulin-dependent diabetic inmates shall be offered immunization against influenza annually (unless the serum is generally unavailable). Insulin-dependent diabetics shall be offered immunization against pneumococcus once and then repeated after age 64 if more than five years have passed since the first one.

16. Diabetic inmates shall be offered a full physical examination by a physician/nurse practitioner annually, and shall be enrolled in a regularly scheduled chronic-disease clinic staffed by professionals with training and expertise in management of diabetes, and which follows detailed written protocols for routine assessment and care. Diabetic inmates with poor control of their blood sugar should be seen more often, as medically necessary, to improve their clinical control. The frequency of visits shall be as frequent as necessary for appropriate medical management of the inmate, but no less frequently than quarterly.

17. Diabetic inmates with numbness, pain, indigestion, dizziness, or other symptoms related to patients with nerve damage shall be offered necessary treatment and, when medically necessary, referral to appropriate specialists

## J. DIET AND EXERCISE

18. All general population inmates with diabetes shall be afforded an opportunity for daily large muscle exercise of approximately a one-hour duration. Inmates in segregation shall be afforded an opportunity for daily large muscle exercise of approximately forty-five minutes duration.

19. The current ADOC menus for diabetic inmates, "Consistent Carbohydrate Diet" and "1800 Calorie Diet," will be revised to be in accordance with the most current standards for diabetic diets. These standards are included in the American Diabetes Association's *Evidence–Based Nutrition Principles and Recommendations for the Treatment and Preventions of Diabetes and Diabetes–Related Complications,* the American Dietetic Association *Manual of Clinical Dietetics,* and the *2003 Exchange Lists for Meal Planning.* Dietary/nutrient intake as referenced in these standards include:

a. Less than 10% derived from saturated fats.

b. Less than 300 mg dietary cholesterol per day.

c. Nutrient distribution of approximately 50% carbohydrates, 20% protein, and 30% fat.

d. Avoiding fructose as an added sweetener.

20. The ADOC will include at least two fruit servings per day. The term "fruit" is defined as fresh fruit, canned fruit (water-

packed, juice-packed, rinsed or artificially sweetened), or one-half cup of 100% fruit juice.

21. The menus will be revised to ensure that the carbohydrate content of meals and snacks is consistent from day to day. (The carbohydrate content of each breakfast may be different from the carbohydrate content of each lunch, dinner and snack, but the carbohydrate content of each type of meal will be consistent from day to day.)

22. The commissary shall offer diabetic items for purchase by inmates such as sugar substitutes and sugar-free snacks. The commissary shall also sell instant glucose tablets for inmates who suffer from hypoglycemia.

23. When medically necessary, the ADOC shall provide diabetic inmates with individually-prescribed special diabetic meals, as ordered by a physician or nurse practitioner.

24. Diabetic inmates shall be provided meals and snacks during any trips outside of the facility, consistent with any special diabetic meals prescribed for the inmate within ADOC.

25. Inmates who are housed at work-release centers may eat meals outside of ADOC facilities. Any such meals shall not be governed by the provisions listed in paragraphs 19–24, above.

**K. EDUCATION**

26. The ADOC shall provide twice-yearly educational and nutritional classes for diabetic inmates. Such education shall be given by a knowledgeable diabetes educator and may be offered individually or to a group of diabetic inmates.

27. The ADOC shall make available and distribute to inmates printed self-care materials, including printed materials created by the ADA. If the supply of such materials is exhausted, it shall be refilled as soon as possible.

28. ADOC security staff shall be trained to recognize and treat hypoglycemia, and to recognize the symptoms and signs of other serious metabolic decompensation, and to refer the inmate for appropriate care. The medical unit shall stock, and appropriate staff shall be trained to administer, glucagons.

**L. TIMING**

29. Absent any unforeseen delays that are outside the control of the ADOC, the Defendant agrees to implement the new diabetes policies and procedures by November 6, 2003. Training of medical and correctional staff in the recognition of emergent diabetic situations shall be completed by December 31, 2003.

**M. CONSULTING AND REPORTING**

30. The contract monitor who is employed to monitor the contract between the ADOC and the contract medical provider shall monitor this agreement to ensure compliance. The contract monitor shall not be an ADOC employee.

31. For a two year period beginning on December 1, 2003, and ending on December 1, 2005, the contract monitor will report to plaintiffs' counsel his or her evaluation of the ADOC and contract provider's compliance with the terms of this agreement. This report shall include: (1) all monthly contract monitor reports, including the data upon which the reports rely; (2) deficiencies found to exist by the contract monitor and any recommendations made by the contract monitor to correct these deficiencies; (3) the contract medical provider's written response to any cited deficiencies and details of any corrective actions that will be taken; (4) any notice by the ADOC that the contract medical provider has failed to perform adequate

corrective actions or is in default of its contractual obligations; and (5) any other documents reflecting any evaluation by any entity of the care provided to inmates with diabetes.

32. The contract monitor's reports and any documents reviewed or information obtained during the monitoring period may be used by either party in an action to enforce the Settlement Agreement in court or in any new action brought by the Plaintiffs. Otherwise, any report by the contract monitor shall remain confidential.

## N. DISCLAIMER OF LIABILITY

33. The Plaintiffs and Defendant expressly acknowledge and agree that this Settlement Agreement does not constitute an admission of liability by the Defendant or the ADOC.

## O. ENFORCEMENT OF SETTLEMENT AGREEMENT

34. This Settlement Agreement is not a consent decree, and is not enforceable in federal court. In the event of non-compliance with any of the terms in this Settlement Agreement, the plaintiffs may only enforce the Settlement Agreement in state court, pursuant to 18 U.S.C. § 3626(c)(2)(B).

35. The Plaintiffs are not precluded from bringing a new action in federal court in the event of non-compliance with the terms of this Settlement Agreement. In the event that Plaintiffs' current counsel bring suit on any of the issues presented in this action before December 1, 2005 (the end of the consulting and reporting period), the newly filed action will be considered a related case. All discovery that has been exchanged to date will be deemed to be part of discovery in any such new action. All documents provided to the contract monitor and all contract monitor reports that were written pursuant to para. 27 will be admissible in any such new action.

## P. DISMISSAL

36. If the Court approves this Settlement Agreement, the current case will be dismissed without prejudice from federal court.

## Q. NAMED PLAINTIFFS' RIGHT TO BRING SEPARATE DAMAGE ACTIONS

37. This lawsuit was brought for injunctive relief only. The Defendant agrees that the settlement of this lawsuit does not create the defense of res judicata or collateral estoppel as to any damage claims brought by any of the named Plaintiffs, and the Defendant agrees not to raise such defenses as to any claim for damages brought by any of the named Plaintiffs.

## R. PLAINTIFFS' ATTORNEY'S FEES AND COSTS

38. The Plaintiffs waive all attorney's fees and costs associated with this lawsuit.