**Linda LAUBE, et al., Plaintiffs,**

v.

**Donal CAMPBELL, et al., Defendants.**

**No. 2:02cv957–T.**

United States District Court,
M.D. Alabama,
Northern Division.

Aug. 23, 2004.

---

4. Order, entered July 13, 2004 (Doc. no. 17).

5. Notice, filed July 14, 2004 (Doc. no. 22).

**1236**

George E. Schulz, Jr., Holland & Knight, Jacksonville, FL, Gretchen Naomi Rohr, Holland & Knight, Atlanta, GA, John A. Russell, III, Aliceville, AL, Lisa Kung, Stephen B. Bright, Atlanta, GA, Tamara S. Caldas, Southern Center for Human Rights, Atlanta, GA, Marion D. Chartoff, Montgomery, AL, for Plaintiffs.

Andrew Weldon Redd, William F. Addison, Alabama Department of Corrections, Legal Division, Ellen Ruth Leonard, Alice Miller Maples, Charles B. Campbell, Montgomery, AL, Giles G. Perkins, James Edward Murrill, Jr., James Arthur Patton, Jr., Miller, Hamilton, Snider & Odom, LLC, Birmingham, AL, Hugh C. Nickson, III, Miller, Hamilton, Snider & Odom, Montgomery, AL, Michael M. Shipper, Miller Hamilton Snider & Odom, Mobile, AL, Edward Andrew Hosp, Maynard, Cooper & Gale, PC, Montgomery, AL, James Victor Doyle, Jr., K. Stephen Jackson PC, Birmingham, AL, Lee Calligaro, Epstein, Becker & Green PC, Washington, DC, Paul Anthony Clark, Balch & Bingham, Montgomery, AL, for Defendants.

## OPINION

MYRON H. THOMPSON, District Judge.

In this class-action lawsuit, the plaintiffs (on behalf of themselves and all other women incarcerated by the Alabama Department of Corrections) claim that the defendants (who are various state officials) are deliberately indifferent to the denial of female prisoners' basic human needs, to the denial of their serious medical needs, and to their substantial risk of serious physical violence; the plaintiffs charge the defendants with violations of the Eighth Amendment to the United States Constitution, as made applicable to the States by the Fourteenth Amendment and enforced through 42 U.S.C.A. § 1983. Jurisdiction is proper under 28 U.S.C.A. §§ 1331 and 1343.

This case is now before the court on the parties' joint motion to approve two four-year settlement agreements that will resolve all the claims in the case: the Conditions Settlement Agreement and the Medical Settlement Agreement. Based on a careful consideration of the parties' motion, the proposed settlement agreements and the objections to them, and the representations by counsel, and after a first-hand review of the current conditions of one of the state facilities that house the plaintiffs, the court will approve the proposed settlement agreements and enter a judgment, with the agreements attached.

## I. BACKGROUND

The plaintiffs originally filed this lawsuit in August 2002. Broadly speaking, the court would characterize their allegations as follows: that because of conditions at the three state prison facilities that house all female inmates (Julia Tutwiler Prison for Women, the Edwina Mitchell Work Release Center (now known as the Tutwiler Annex), and the Birmingham Work Release Center), female inmates are being denied their basic human needs of adequate living space, ventilation, and personal safety and security; that because of the defendants' failure to provide adequate medical and mental health care, female inmates are at a real and substantial risk of injury, prolonged illness, and premature death; and that the defendants have acted with deliberate indifference to the existence of these conditions. The procedural history of this litigation and a vivid description of the conditions at Tutwiler, the Tutwiler Annex, and the Birmingham facility at the time this case was filed can be found in this court's earlier reported decisions. *Laube v. Campbell*, 255 F.Supp.2d 1301 (M.D.Ala.2003) (Thompson, J.); *Laube v. Haley*, 242 F.Supp.2d 1150 (M.D.Ala.2003) (Thompson, J.); *Laube v. Haley*, 234 F.Supp.2d 1227 (M.D.Ala.2002) (Thompson, J.).

In early 2004, counsel for all parties met informally to discuss settlement, and, in April 2004, formal mediation under the guidance of Chief Magistrate Judge Charles S. Coody began. In June 2004, counsel reached final agreement on all provisions of the proposed agreements, and, on June 25, filed a joint motion asking the court to adopt the agreements, both of which are signed by the following: plaintiffs' counsel; defendants' counsel; and defendants Donal Campbell (Commissioner of the Alabama Department of Corrections), Troy King (Attorney General of Alabama), and Bob Riley (Governor of Alabama). The agreements are intended to settle all the claims contained in the plaintiffs' second amended complaint; they expire in four years.

On July 1, 2004, the court provisionally approved the two settlement agreements and, with the approval of all parties and because of the urgent need for relief, also provisionally enjoined the defendants from failing immediately to carry out their provisions, that is, pending their final court approval. The court further ordered that, "[i]f the settlements are not ultimately approved by the court, then this order shall be vacated," and that "[t]he settlements shall expire, in accordance with their terms, four years from July 1, 2004, the date the agreements were provisionally enforced."

The court further approved the parties' plan for notifying class members of the proposed settlements and for soliciting and receiving class members' feedback. Based on the parties' representations contained in the two agreements, the court also granted the plaintiffs' motion for class certification.

On July 21, 2004, the court held a fairness hearing at Tutwiler Prison on the proposed settlements, during which the court heard testimony from seven class

members and Tutwiler Warden Gladys Deese. After the hearing, the court toured the facility as it had done at the outset of this litigation almost two years ago.

## II. DISCUSSION

■ Judicial policy favors voluntary settlement of class-action cases. *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977).[1] However, "the settlement process is more susceptible than the adversarial process to certain types of abuse and, as a result, a court has a heavy, independent duty to ensure that the settlement is 'fair, adequate, and reasonable.'" *Paradise v. Wells,* 686 F.Supp. 1442, 1444 (M.D.Ala. 1988) (Thompson, J.); *accord* Fed.R.Civ.P. 23(e)(1)(C) ("The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement is fair, reasonable, and adequate."). Court review is "essential to assure adequate representation of class members who have not participated in shaping the settlement." Fed.R.Civ.P. 23(e) advisory committee's note. In addition to analyzing the fairness of the proposed settlement, the court must assure that it is not illegal or against public policy. *Piambino v. Bailey,* 757 F.2d 1112, 1119 (11th Cir.1985); *Paradise,* 686 F.Supp. at 1448. The court must also determine whether notice to the class was adequate, Fed.R.Civ.P. 23(e), and must examine the class members' comments and objections, *Paradise,* 686 F.Supp. at 1444, and the judgment of counsel, *id.* at 1446. Because this case involves a challenge to prison conditions, the court must also determine whether the settlement is subject to the requirements of the Prison Litigation Reform Act (PLRA), 18 U.S.C.A.

§ 3626, and, if so, whether those requirements have been met.

## A. PLRA

■ "The PLRA strictly limits the prospective relief a federal court may order in cases concerning prison conditions." *Gaddis v. Campbell,* 301 F.Supp.2d 1310, 1313 (M.D.Ala.2004) (Thompson, J.). Although "private settlement agreements" are not subject to the statute's limitations, *see, e.g., id.* at 1313–14, the agreements in this case are subject to judicial enforcement and are thus within the scope of the statute, 18 U.S.C.A. § 3626(c)(2) & (g)(6).

■ The PLRA provides that a "court shall not grant or approve any prospective relief unless the court finds that such relief [(1)] is narrowly drawn, [(2)] extends no further than necessary to correct the violation of the Federal right, and [(3)] is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C.A. § 3626(a)(1)(A). The court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C.A. § 3626(a)(1)(B).

In most cases, the court must "engage in a specific, provision-by-provision examination of [a] consent decree[ ], measuring each requirement against the statutory criteria." *Cason v. Seckinger,* 231 F.3d 777 (11th Cir.2000). However, it is not the case that "the district court must conduct an evidentiary hearing about or enter particularized findings concerning any facts or factors about which there is not dispute." *Id.* at 785 n. 8. "The parties are free to make any concessions or enter into stipulations they deem appropriate." *Id.*

---

**1.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as

binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Here, all parties concur that the PLRA's requirements are met. The parties agree that the proposed settlement agreements satisfy the statute's three-part "need-narrowness-intrusiveness' requirements. The court finds that the two proposed agreements, in particular the remedial provisions to which the parties have agreed, are based on an informed assessment of the facts and the law and represent the parties" considered judgment as to what is necessary, narrow, and least intrusive with respect to the specific problems presented in this case, with which the parties are intimately familiar. The parties also agree that the two agreements "will not have an adverse impact on public safety or the operation of the criminal justice system." 18 U.S.C.A. § 3626(a)(1)(B).

▪ At the fairness hearing, the court expressed some concern that the provision of the Medical Settlement Agreement creating the healthcare monitor position could implicate the PLRA's requirements with respect to special masters. *See* 18 U.S.C.A. § 3626(f).[2] As described below, an independent healthcare monitor is charged with conducting regular audits to monitor implementation. The healthcare monitor will have access to prisoners and their medical records, to members of the medical and security staff, and to any other source of information he deems necessary to determine compliance with the agreement. The healthcare monitor will also prepare reports following regular on-site inspections, and the institution's quality-improvement committee will address any areas requiring improvement. The monitor must provide copies of his or her reports to counsel for the plaintiffs and the defendants as well as file copies with the court. The court is satisfied, for the reasons articulated by the United States Court of Appeals for the Second Circuit in *Benjamin v. Fraser,* 343 F.3d 35, 44–46 (2d Cir.2003), that the healthcare monitor is not a special master for purposes of the statute.

In *Benjamin,* the Second Circuit held that the Office of Compliance Consultants (OCC), which had been appointed to monitor compliance with the consent decrees in a prison-conditions case, was not subject to

---

2. Section 3626 provides in part:
 "(f) Special Master.—
 (1) In general.—
 . . .
 (B) The court shall appoint a special master under this subsection during the remedial phase of the action only upon a finding that the remedial phase will be sufficiently complex to warrant the appointment.
 . . .
 (5) Regular review of appointment.—In any civil action with respect to prison conditions in which a special master is appointed under this subsection, the court shall review the appointment of the special master every 6 months to determine whether the services of the special master continue to be required under paragraph (1). In no event shall the appointment of a special master extend beyond the termination of the relief.
 (6) Limitations on powers and duties.—A special master appointed under this subsection—

 (A) may be authorized by a court to conduct hearings and prepare proposed findings of fact, which shall be made on the record;
 (B) shall not make any findings or communications ex parte;
 (C) may be authorized by a court to assist in the development of remedial plans; and
 (D) may be removed at any time, but shall be relieved of the appointment upon the termination of relief.
 "(g) Definitions.—As used in this section—
 . . .
 (8) the term "special master" means any person appointed by a Federal court pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court to exercise the powers of a master, regardless of the title or description given by the court. . . ."

the PLRA's provisions governing special masters. The court explained that:

"The term 'special master' is defined by the PLRA as 'any person appointed by a Federal court pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court to exercise the powers of a master, regardless of the title or description given by the court.'" 18 U.S.C. § 3626(g)(8).....

"The powers of special masters, who are quasi-judicial officers, are set forth generally in Federal Rule of Civil Procedure 53. They include the ability to convene and to regulate hearings, to rule on the admissibility of evidence, to subpoena and swear witnesses, and to hold non-cooperating witnesses in contempt. Fed.R.Civ.P. 53(c)-(d). The master's responsibilities typically culminate in a report. If the report includes findings of fact, they are binding in non-jury actions unless clearly erroneous." Fed.R.Civ.P. 53(e)(2).

"The OCC's functions are quite different from those of a Rule 53 special master. The OCC was not appointed to hold hearings, subpoena witnesses, take testimony, or rule upon evidence. It does not prepare reports to assist in the court's determination of discrete issues of law or fact, and its factual findings are not legally entitled to deference. The OCC's reports, which are neither formally filed in the court's docket nor adopted, modified, or rejected by the court, serve a different function from the typical report of a special master. Besides informing the court of ongoing compliance efforts, these reports facilitate the City's awareness of its compliance with remedial directives. In other words, the OCC serves a monitoring function; it does not exercise quasi-judicial power."

*Benjamin,* 343 F.3d at 45–46 (citations omitted). In addition, the Second Circuit explained that, "Nothing in the text of § 3626(f) expressly reveals Congress's intent either to treat all court-appointed agents as special masters or to prohibit a court from appointing agents to perform functions that differ from the quasi-judicial activities of special masters." *Id.*

For the same reasons that the Second Circuit found that the OCC was not a special master under the PLRA, the healthcare monitor here is not a special master for purposes of that statute. The healthcare monitor "serves a monitoring function; it does not exercise quasi-judicial power." *Id.*

■ Finally, the PLRA provides that "[n]o action shall be brought with respect to prison conditions ... until such administrative remedies as are available are exhausted." 42 U.S.C.A. § 1997e(a). The Eleventh Circuit recently suggested that the district courts must independently determine whether the plaintiffs have complied with § 1997e. *Chandler v. Crosby,* 379 F.3d 1278, 1286–88 (11th Cir.2004). Section 1997e's exhaustion requirement is inapplicable in this case because, as all parties agree, no administrative remedies were available to the plaintiffs.

In sum, the court is satisfied that it is in full compliance with the PLRA in approving the settlement agreements.

### B. Notice

■ The court must ensure that all class members are informed of the agreements and have the opportunity to voice their objections. Fed.R.Civ.P. 23(e); *Austin v. Hopper,* 28 F.Supp.2d 1231, 1236 (M.D.Ala.1998) (Thompson, J.). In this case, class members were provided ample information regarding the terms of the settlement agreements and plenty of opportunities to comment on the agreements. In June 2004, plaintiffs' counsel visited the three facilities, including death row and

each individual segregation cell, and talked to class members directly about specific provisions of the agreements and the relative merits of settlement versus trial. Plaintiffs' counsel encouraged class members to take advantage of the opportunity to file objections or concerns.

Starting in July 2004, at each of the three facilities, the defendants posted a court-approved notice of the agreements, provided at least one hundred copies of a court-approved comment form, and provided drop boxes for the comment forms. Prison officials made additional comment forms available after it became clear that the forms were missing from the drop box location at Tutwiler for a few days during the week of July 12. To further ensure that class members were not discouraged from submitting comments by the lack of forms, plaintiffs' counsel visited both the Tutwiler and Birmingham facilities and spoke to 25 women, strongly encouraging them to submit comments and to inform others that anyone with a comment or objection should submit a written response.

Prison officials also made an announcement over the intercom system in the main building at Tutwiler on the morning of July 16, reminding the women that comment forms were due at noon that day.

Class members submitted a total of 81 responses to the agreements. Based on the extensive communication by plaintiffs' counsel with class members regarding the agreements, the substantial number of written responses filed, and the fact that the court received comments from every dormitory and the segregation unit, it is apparent that class members were well aware of—and, indeed, took advantage of—the opportunity to voice their concerns about the proposed agreements. The court concludes that these measures were sufficient to satisfy the notice requirement of Rule 23(e) of the Federal Rules of Civil Procedure.

## C. Objections and Comments

■ To determine whether a proposed settlement is fair, adequate, and reasonable, the "first place a court should look is to the views of the class itself." *Paradise*, 686 F.Supp. at 1444. Even though only 81 of the approximately 1,250 class members filed a written comment regarding the settlement, the court does not assume that silence from the remaining class members indicates support for the settlement agreements. Particularly in prison litigation, where members of the class may have lower literacy levels or may not feel entirely free to submit objections, "the court must look beyond the numbers to the total reality of the circumstances presented and from those circumstances attempt to extrapolate some picture of the true support for the [settlement]." *Reynolds v. King*, 790 F.Supp. 1101, 1109 (M.D.Ala.1990) (Thompson, J.).

Seven of the 81 comments include an explicit statement opposing, or objecting to, the settlement agreements. Two class members object to the agreements because they believe the Alabama Department of Corrections will fail to comply with them. Two women at Tutwiler object to the agreements because of the continuing problem of housing mental-health inmates in segregation and on death row. A resident of Dorm 9 at Tutwiler objects because nothing in the agreements redresses the hot exhaust pushed into that dorm by an adjacent staff office's air-conditioning unit. A resident of Dorm 3 at Tutwiler objects because no provision addresses abuse or harassment by correctional officers. One woman submitted a detailed list of the portions of the settlement agreements to which she objects, with reasons for each of her objections.

Twenty-one of the 81 submissions include explicit statements in support of the settlement. Many within this group express their support for the agreements but also voice concerns similar to the comments of those who wrote in opposition. For example, two women who wrote in support of the agreements include the caveat that they are in support so long as the Corrections Department will actually implement the agreements and the court will enforce them. The majority of those women who explicitly support the agreements have either witnessed some change or are hopeful they will see improvements once the settlement agreements are finally approved.

The remaining comments neither explicitly object to nor explicitly support the agreements. Rather, most of these comments can be characterized as concerns about the conditions of confinement. Nearly all the women who submitted a response wrote about more than one area of concern. Within the 81 comment forms and letters received, class members made approximately 350 discrete comments. These comments can be grouped into eight categories: (1) heat and ventilation; (2) living space; (3) safety and security; (4) medical care; (5) mental health; (6) implementation, monitoring, and enforcement; (7) conditions in segregation; and (8) other concerns.

### 1. Heat and Ventilation

Thirty-seven women wrote a total of 117 comments related to the heat and ventilation at Tutwiler. While some class members wrote generally that the prison is too hot, most pointed to specific areas where, they allege, the defendants have failed to comply with the court's order provisionally enforcing the settlement agreements. Some class members wrote that there are not enough fans in their dorms or that the fans just blow hot air around the room. Others are concerned about whether and how often officers will take the temperature in the dorms. Testimony at the fairness hearing echoed these written complaints.

In general, class members' concerns regarding the heat and lack of ventilation at Tutwiler are addressed by sections five (heat), six (shade), ten (physical plant), eleven (facility maintenance), 15 (ventilation), 16 (recreational opportunities), and 18 (programming) of the Conditions Settlement Agreement. So long as these sections are all implemented consistently, the agreement will provide some relief to class members. It may be that other steps could provide more relief or that these provisions would not be sufficient under other circumstances. Nonetheless, the particular remedial provisions to which the parties agreed represent what is necessary, narrow, and least intrusive with respect to the specific heat and ventilation problems presented in this case.

The court was very encouraged to see that, on the day of the fairness hearing, some of the complaints registered by women during the notice period had already been addressed. For example, the windows that had been barred shut earlier in the summer were open, and prison officials had secured sufficient ice to make it freely available, as agreed to in the settlements. Officials were also in the process of implementing the Conditions Settlement Agreement's provisions regarding permission to wear shorts after 3:30 p.m., permission to take additional showers, installation of exhaust fans in the dormitories, and the addition of shade structures for most of the dormitories.

In sum, the court is satisfied that, so long as all ameliorative measures agreed upon by parties are consistently and fully implemented, the agreements fairly and adequately address the concerns raised by

class members regarding heat and ventilation.

## 2. Living Space

Twenty women submitted a total of 24 comments related to living space or overcrowding. Several wrote generally that the prison is overcrowded. Others wrote that the lack of space means that women are sleeping, washing, and using the restroom with no more than a few inches separating them. Twelve women have particular concerns about problems with classification that, if remedied, could help reduce the population.

The parties have agreed upon a set of measures that, taken together, are narrowly tailored to ameliorate the problems associated with the limited living space available to class members. Sections seven (outdoor exercise), nine (visitation), 16 (recreational opportunities), 17 (drug treatment), and 18 (programming) of the Conditions Settlement Agreement, in concert and fully implemented, will reduce the total amount of time each inmate must spend within the limited available living space. Sections 12 (toilets and showers), 13 (environmental safety), and 14 (laundry) will ensure that what space is available is livable. Finally, section four (population flow) specifies that the Alabama Department of Corrections will work cooperatively with plaintiffs' counsel to minimize unnecessary delays in the review and reduction of inmate classification levels. Taken together, these provisions of the settlements adequately address class members' concerns.

## 3. Safety and Security

Twenty women submitted a total of 25 comments related to safety and security. These included concerns that Corrections Department facilities are not safe due to idleness, lack of access to recreation, and officer misconduct and verbal intimidation. Some of the women simply note that the lack of out-of-dorm activities increases tension or that high stress levels lead to violence. Others include suggestions about increasing constructive activities and work opportunities. Some women note that many officers are working overtime shifts that make them tired and short-tempered. Ten women wrote comments about officer misconduct, favoritism, prejudice, verbal abuse, and intimidation.

Rather than simply increase the total number of officers, for example, or replace open dorms with single cells, the parties have agreed upon a combination of measures that will, so long as all measures are fully implemented, remedy the safety problems in a manner that is necessary, narrowly tailored, and the least intrusive. These measures are contained in sections 19–24, as well as seven, nine, and 16–18 of the Conditions Settlement Agreement. The court is satisfied that these provisions, taken together, fairly and adequately address the safety and security concerns raised by class members.

## 4. Medical Care

Two class members at the fairness hearing expressed concerns about medical care at Tutwiler, and 27 others submitted written comments about various aspects of medical care. The comments include concerns about the training of nurses, officers making medical decisions, access to timely specialty care, medication delays, lapses in medication, having to pay for follow-up care, sick-call procedures, lack of response by medical staff to serious medical needs, and lack of information about illnesses and medications. Many wrote about a general concern that the defendants would simply fail to carry out the terms of the agreements, or would comply with certain parts and ignore others. The Medical Settlement Agreement provides for extensive and detailed improvements in medical access and care and adequately addresses the concerns articulated during the notice process.

### 5. Mental Health

Ten women wrote comments about mental-health issues. Three women expressed concern that women with serious mental illnesses are housed in segregation or on death row because of a lack of space elsewhere. Others offered more general comments about the lack of specialized housing for women with serious mental disabilities. Still others submitted concerns about the teasing and intimidation of mentally ill women who are co-mingled with the general population.

Sections V.Q–V.X of the Medical Settlement Agreement addresses these concerns. Specifically, the objection to housing severely mentally ill women in segregation or on death row is addressed by the defendants' agreement to create a mental-health residential treatment unit for the most seriously mentally ill women at Tutwiler.

### 6. Implementation, Monitoring, and Enforcement

Eleven women submitted comments expressing concerns about implementation, monitoring, and enforcement, and witnesses at the fairness hearing testified to similar concerns. Some women are specifically concerned about officers' attitudes towards the settlement agreements, as reflected in comments and actions indicating a reluctance to implement the required changes. Other women are more generally concerned about the defendants' willingness or ability to implement the changes contained in the agreements.

The agreements are designed to ensure full implementation of their provisions. Transparency is the keystone to monitoring the agreements, and the agreements provide a number of provisions to this end. Plaintiffs' counsel will have reasonable access to prison records and prison facilities, including regular walk-through visits, and will maintain intensive client contact.

As stated above, the Medical Settlement Agreement provides for an independent healthcare monitor charged with conducting regular audits to monitor implementation. The healthcare monitor will have access to prisoners and their medical records, to members of the medical and security staff, and to any other source of information he deems necessary to determine compliance with the agreement; the healthcare monitor will also prepare reports following regular on-site inspections, and the institution's quality-improvement committee will address any areas requiring improvement.

As required under section 27 of the Conditions Settlement Agreement, and as testified to by Warden Deese at the fairness hearing, the defendants are responsible for ensuring that agents, representatives, and employees of the Corrections Department—including line officers—understand the scope and importance of the settlement agreements. Finally, anticipating disputes and lapses in implementation, section XI.B of the Medical Settlement Agreement and section 28 of the Conditions Settlement Agreement specify processes for resolving deficiencies. Taken together, these provisions sufficiently address class members' concern that the settlement agreements be implemented.

### 7. Conditions in Segregation

Seven women wrote about conditions in the segregation unit, including heat and lack of ventilation, restriction to two meals a day, lack of access to medical care, exposure to bugs and spiders, and the use of shackles during exercise. This number is notable, representing nearly a third of the total number of women in segregation. In addition, a class member held in the segregation unit testified at the fairness hearing that the conditions in segregation are substantially different from—and worse

than—the conditions in the rest of the prison.

The court is satisfied that these concerns are adequately met by the settlement agreements. Section 15 of the Conditions Settlement Agreement mandates additional fans in the segregation unit, and other sections of the agreement governing pest control and heat and ventilation apply equally to the segregation unit. The defendants indicated at the fairness hearing that the exterminator will be directed to make additional efforts in the segregation unit and take necessary steps to address the problem.

An objection was raised about the use of shackles on women while they are in the small exercise pen; the concern was that this practice might defeat the provision in the agreements that prisoners in the segregation unit will be provided an opportunity for outdoor recreation for at least 45 minutes every day. Since the fairness hearing, the parties have advised the court that this issue has been resolved. The Corrections Department's standard operating procedures will be amended to provide that women in segregation will not be handcuffed as a matter of course but will only be handcuffed if security needs so dictate. Further, the Corrections Department will document its reasons for the use of restraints. The court is satisfied that this resolution adequately addresses the objection.

### 8. Other Concerns

Thirty-seven women wrote 45 comments about other issues, including maintenance, unfair disciplinary procedures and excessive punishment, a lack of privacy, poor food and improper nutrition, visitation, mail, and a lack of personal hygiene products.

Some of these concerns are addressed, at least partially, by the Conditions Settlement Agreement. In section eleven, the defendants have agreed to develop a pre-ventive-maintenance schedule and policy for upkeep of critical facility functions. The agreement also specifies how the most critical machines—heating and air-conditioning units and ice machines—will be fixed. Under section 13, the defendants will provide prisoners access to cleaning supplies, thoroughly and safely disinfect and clean each living area at least once a month, and provide monthly pest control services. Section five of the Conditions Settlement Agreement specifies that fans are not to be turned off for punitive purposes, and the Corrections Department Commissioner has pledged to insure that line officers at the prisons understand that this is part of the agreement.

Other areas of concern raised by class members, such as interference with mail and problems with disciplinary procedures, were not part of this litigation. As such, the proposed settlement agreements cannot be inadequate for remaining silent on these issues.

After reviewing the written objections and testimony of class members and after a close examination of the proposed settlement agreements, the court finds the overwhelming majority of class objections will be resolved through full implementation of the agreements. The remaining objections must be balanced against the substantial benefits the plaintiffs will derive with certainty from the settlement agreements, and, in striking that balance, the proposed settlements are fair, adequate, and reasonable. *See Paradise,* 686 F.Supp. at 1446 ("[a] settlement is in large measure a reasoned choice of a certainty over a gamble, the certainty being the settlement and the gamble being the risk that comes with going to trial").

### D. View of Class Counsel

In addition to considering the views of class members, the court should also consider the judgment of class counsel. *Pett-*

*way v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1215 (5th Cir.1978); *Gaddis v. Campbell*, 301 F.Supp.2d 1310, 1315 (M.D.Ala.2004) (Thompson, J.). After two years of litigation, extensive discovery, and a focused period of negotiation with defendants' counsel, plaintiffs' counsel believe the settlement agreements are, on balance, in the best interest of the women incarcerated by the State of Alabama.

There is a sound basis for this belief. Plaintiffs' counsel started investigating the conditions of confinement at the women's prisons in Alabama in the summer of 2001. Since that time, they have conducted over 1,000 interviews with women at the Tutwiler facility, the Tutwiler Annex, and the Birmingham facility. Plaintiffs' counsel solicited and incorporated the preferences of class members into the settlement process. Class counsel has also continually relied on correctional experts regarding medical care, security, classification, and heat and ventilation, and now rely on the opinions of these experts in concluding that the settlements are fair, adequate, and reasonable so long as they are implemented in their entirety.

The settlement negotiations between the parties were at arms' length, and there is no suggestion of any collusion between the parties. In addition to being intimately familiar with the facts of this case, plaintiffs' attorneys are experienced in prison litigation and the limitations imposed by the PLRA. The court takes seriously the view of plaintiffs' attorneys that the settlements are fair, adequate and reasonable.

### E. Court's Assessment of the Settlement Agreements

 "Finally, with the above considerations in mind, the court should itself assess whether the settlement ... is fair, adequate, and reasonable." *Gaddis*, 301 F.Supp.2d at 1316 (quoting *Paradise*, 686 F.Supp. at 1446). Relevant factors include the stage in the proceedings; the plaintiffs'

likelihood of success at trial; the complexity, expense, and likely duration of the lawsuit; and the range of possible recovery. *Austin v. Hopper*, 28 F.Supp.2d 1231, 1238 (M.D.Ala.1998) (Thompson, J.).

These factors line up in favor of approving the settlement. The issues involved in this case are complex, and it would have taken an extensive and prolonged—not to mention contentious—trial to resolve them. A full trial of the issues would also have as much as doubled the costs already incurred in this litigation, and prolonging the litigation would have postponed, if not outright denied, some of the relief offered to class members by the settlement agreements. The court is also satisfied that the settlement complies with state and federal law, and does not violate public policy. *Piambino v. Bailey*, 757 F.2d 1112, 1119 (11th Cir.1985).

The court has independently and carefully reviewed the proposed settlement agreements and is satisfied that they are a fair, adequate, and reasonable resolution to this litigation. The settlements will not make the Alabama Department of Corrections' womens's facilities comfortable or pleasant places, but it will afford class members the basic necessities mandated by the United States Constitution.

### III. CONCLUSION

In conclusion, the court wishes to offer three acknowledgments. *First, to the class members who actively participated in this litigation:* As one of plaintiffs' lawyers commented at the fairness hearing, it would have been very easy for the named plaintiffs to sit by, let others do the work, and then reap the reward if the lawsuit succeeded. Those class members who got involved, and, in particular, those whose names appeared on court filings and who testified at hearings, put themselves

out to improve conditions not just for themselves but for all their fellow inmates.

*Second, to Chief United States Magistrate Judge Charles S. Coody, who worked long days over several months to help the parties come to a fair negotiated settlement:* As counsel for the plaintiffs and the defendants jointly acknowledged at the fairness hearing, these settlement agreements and the improvement in conditions for Alabama's women prisoners that will result from them would not have been possible without Judge Coody's masterful work. Moreover, the court cannot overlook the millions in tax dollars that will be saved by avoiding litigation—money that can, of course, now be spent directly on redressing state prison conditions to the extent needed. Thus, not only the named parties and the plaintiff class members but all citizens of the State of Alabama owe Judge Coody a deep debt of gratitude.

*Finally, to Warden Gladys Deese, who, working with extraordinarily limited resources, has already made substantial improvements in the conditions at Tutwiler:* In December 2002, this court wrote that the conditions at Tutwiler were "essentially a time bomb ready to explode facility-wide at any unexpected moment." *Laube v. Haley,* 234 F.Supp.2d 1227, 1252 (M.D.Ala.2002) (Thompson, J.). In July 2004, at the time of the fairness hearing, the court observed substantial improvements in the conditions at Tutwiler. These improvements are testimony to the work of Warden Deese, and the court has full confidence that, in accordance with the provisions of the settlement agreements, she will build on her notable success.

An appropriate judgment will be entered.

## JUDGMENT AND PERMANENT INJUNCTION

In accordance with the memorandum opinion entered on this date, it is the OR-DER, JUDGMENT, AND DECREE of the court as follows:

(1) The objections to the proposed settlements, filed by plaintiff class members in response to the notice to the class, are overruled;

(2) The joint motion to adopt the conditions settlement agreement and the medical settlement agreement, filed by the parties on June 25, 2004 (doc. no. 313), is granted;

(3) The terms of the conditions settlement agreement and the medical settlement agreement, both of which are attached as appendices to this judgment, are incorporated as the order of this court;

(4) In accordance with the terms of both settlement agreements, the court retains jurisdiction to enforce the agreements during their terms;

(5) Defendants Donal Campbell, Gladys Deese, Mary Carter, Ronald Cavanaugh, and Robert Riley in their official capacities, their officers, agents, servants, and employees, and those persons in active concert or participation with them who receive actual notice of this judgment and injunction by personal service or otherwise, are each ENJOINED and RESTRAINED from failing to comply immediately with the terms of the settlements agreements; and

(6) The settlement agreements shall expire, in accordance with their terms, four years from July 1, 2004, the date of the interim order in which they were provisionally enforced.

In order to provide plaintiff class members with notice of the final disposition of this lawsuit, it is further ORDERED that, within 14 days from the date of this judgment, defendant Campbell shall cause to be provided to plaintiff class members notice of the final disposition of this lawsuit, by posting, in accordance with the notifica-

tion process previously approved by the court in section three of its order entered July 1, 2004 (doc. no. 321), this judgment and the accompanying memorandum opinion issued this date.

The clerk of the court is DIRECTED to enter this document on the civil docket as a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

The clerk of the court shall issue a writ of injunction.

## APPENDIX A

### CONDITIONS SETTLEMENT AGREEMENT

#### I. INTRODUCTION

**1. Plaintiffs.** Plaintiffs in this class action are all women who are now or will in the future be incarcerated in an Alabama Department of Corrections facility. This action was filed seeking declaratory and injunctive relief for violations of their Eighth and Fourteenth Amendment rights.

**2. Defendants.** Defendants in this case are Donal Campbell, Commissioner of the Alabama Department of Corrections ("ADOC"); Bob Riley, Governor of Alabama; Gladys Deese, warden of Julia Tutwiler Prison for Women; and Mary Carter, warden of Birmingham Work Release. All Defendants are sued in their official capacity. The Plaintiff class and all Defendants are parties to this Final Settlement Agreement. The term "Defendants" refers to all these Defendants and their successors, agents, and assigns.

**3. Scope.** This Conditions Settlement Agreement is submitted and entered into as a settlement of claims for declaratory and injunctive relief as set forth in Plaintiffs' Second Amended Complaint, filed on December 18, 2002, as well as a settlement of all attorneys' fees and costs. The parties hereby agree to the following terms.

#### II. LIVING CONDITIONS.

**4. Population flow.** The ADOC shall provide access to and cooperate with representatives from community corrections programs to identify women who are qualified for community corrections placements. Caseload officers shall receive up-dated information about community corrections, including identification of women appropriate for supervised release programs. Classification reviews for all women (including those at Birmingham Work Release) shall be conducted at least every 6 months. Plaintiffs' counsel, paralegals, consultants, and experts shall be permitted on a semi-annual basis to review institutional records and other documents relevant to classification for the purpose of identifying mistakes and working cooperatively with the ADOC and its representatives to correct such mistakes.

**5. Heat.** Dormitories housing special populations (mental health, aged and infirm, or HIV-positive) shall be kept at ambient temperatures between 65 and 85 degrees Fahrenheit. The ADOC shall purchase and maintain five additional commercial ice machines (or enough ice machines to increase current ice production by 50%) suitable for use in correctional facilities, and shall make ice freely available to women at Tutwiler Prison at all times. Women shall have the option of wearing shorts starting at 3:30 p.m. Additional showers shall be permitted when temperatures reach 85 degrees Fahrenheit or higher in the dormitories. The ADOC shall conduct temperature readings twice daily in each living unit, install thermometers in each dormitory, and calibrate temperature guns as necessary. Neither fans nor air conditioning shall be turned off for punitive purposes.

**6. Shade.** The ADOC shall provide shaded outdoor enclosures attached to each dormitory at the main Tutwiler facili-

ty. The ADOC need not provide such enclosures to Dorm 5 (formerly the chapel) and Dorm 10 (the freestanding structure at the north side of the prison) so long as women housed in those dorms are provided regular programming that incorporates outdoor exercise time on weekdays.

**7. Outdoor exercise.** For every woman housed in the dormitories, defendants shall provide an opportunity for outdoor recreation in the large recreation yard at least one hour per day, five days per week. Defendants shall make best efforts to maximize the amount of time permitted outdoors during the weekends. For women housed in the mental health unit, receiving unit, or HIV+ unit, the ADOC may conduct exercise time in the smaller yards attached to those units.

**8. Segregation exercise.** For women in segregation, Defendants shall provide an opportunity for outdoor recreation at least 45 minutes a day, seven days a week.

**9. Visitation.** All women shall be allowed at least two visits with family and loved ones each month.

**10. Physical plant.** The ADOC shall alter the windows in the Tutwiler facility so that the top row of windows that can be safely opened to at least 45 degrees, and the bottom row of windows can be fully opened for air circulation.

**11. Facility maintenance.** The ADOC shall develop a preventative maintenance schedule and policy for upkeep of critical facility functions, including but not limited to locks, plumbing, electrical systems, roof structures, drop ceilings, windows, floors, HVAC systems and window air conditioning units used in living spaces, laundry systems, dishwashing equipment, cooking equipment, and refrigeration units. The maintenance schedule shall provide for review and upkeep of all covered areas at least quarterly. A log, con-

taining updated reports of the status of all facility maintenance, will be kept on site. Heating, air conditioning units, and ice machines that malfunction shall be repaired promptly. When on-site maintenance staff or ADOC engineering staff are not able to make the repair within 24 hours, the ADOC shall secure a qualified person to make the repair. Ice machines that malfunction shall be repaired within 7 days, unless a necessary replacement part is not available during that time. The ADOC shall secure sufficient ice from other machines or outside sources when one or more ice machines are broken.

**12. Toilets and showers.** The ADOC shall continue to make daily checks Monday through Friday of each toilet and shower area for maintenance needs. Such checks, the problems noted during such checks, and the steps taken to remedy those problems shall be documented.

**13. Environmental safety.** The ADOC shall thoroughly and safely disinfect and clean each living area at least once a month, and shall ensure that each living area receives monthly pest control services for spiders, roaches, and other vermin. Women shall be permitted sufficient, supervised access to cleaning supplies and equipment, including a disinfectant such as bleach, to keep all living and bathing areas clean. Bathroom and bathing areas, as well as living areas, shall be regularly cleaned to control mold and staphylococcus in a medically sound manner.

**14. Laundry.** For every 250 women for whom the Tutwiler laundry facility is doing laundry, there shall be available and functional at least one 125 pound capacity washer, one 125 pound capacity dryer, and one presser.

**15. Ventilation.** The ADOC shall install and maintain an exhaust fan in each of Dormitories 1–8 that are not tempera-

ture controlled. The ADOC shall install 2 exhaust fans in Dormitory 9. In the segregation unit, at least one wall-mounted rotating fan shall be installed and maintained for every 3 cells.

16. Recreational opportunities. Recreational equipment (such as softball, volleyball, and basketball equipment) shall be available during the time that the recreation yard is open. Women shall be permitted and encouraged to organize exercise classes, subject to reasonable limitation on the number and frequency of such classes according to the availability of correctional officers to supervise the women participating in such classes. Notice of the availability of exercise equipment and exercise classes shall be included in the daily institutional newsletter at least once a month and at orientation. Defendants shall cooperate with community, civic and nonprofit groups, and dormitory representatives to continually improve and increase recreational activities for women.

17. Drug treatment. The ADOC shall provide adequate and appropriate drug treatment programs to accommodate all women who are sentenced to complete such programs. Where the completion of a drug treatment program is a condition of release, including in split sentences, and the prisoner can be released upon completion of a drug treatment program, such a woman shall be placed in the next available drug treatment program.

18. Programming. The ADOC shall provide adequate and appropriate vocational, educational, industrial, therapeutic, or other appropriate programming to accommodate at least 60% of the total female inmate population. The ADOC shall continue to cooperate with community, civic and nonprofit groups to continually improve and increase programming opportunities to women.

### III. SAFETY AND SECURITY.

19. Staffing. Security officers shall be on post in sufficient numbers so that each officer is supervising no more than 50 women each in the dormitories. The ADOC shall document the overall vacancy rate among staff positions authorized for working directly with inmates. This vacancy rate shall not exceed 10 percent for any 18–month period. Security officers with duties that include direct inmate supervision shall not work more than 16 hours at a stretch, and must have at least 8 hours off between shifts.

20. Lines of sight. The ADOC shall make best efforts to ensure that there are no blocked lines of sight from any security post throughout the area that post is intended to secure. Doors where inmates regularly enter or exit a room shall not obstruct the line of sight. Doors may be made entirely or partially of grilled bars, or shall have large windows at eye level to permit continuous lines of sight between areas separated by the door.

21. Drug testing. The ADOC shall develop a drug testing policy containing comprehensive safeguards for drug testing accuracy at Birmingham Work Release. Plaintiffs' counsel shall be permitted to review and comment on the policy prior to its final adoption. At a minimum, the policy shall correct the current failure to consider medication usage in drug testing and shall ensure there is a mechanism for identifying and investigating unusual results.

22. Punishment. The ADOC shall not punish women in their care through deprivation of minimally nutritious meals, or forcing them to remain in the same position for any pre-determined period of time. Women at Birmingham Work Release shall not be punished when they are unable to do their jobs due to physical limitations or sexual harassment on the jobsite.

Women at Birmingham Work Release shall not be denied visitation for dorm failures as a matter of course.

**23. Single cells.** The ADOC shall maintain or have available sufficient segregation cells to house at least 4% of the total female population.

**24. Classification.** The ADOC shall maintain a classification system that specifies at least three levels of custodial control and inmates should be assigned to the least restrictive custody level necessary. The ADOC shall maintain sufficient bedspace to implement such a system. Any delays or revisions of housing placements that are caused at least in part by lack of immediately available bedspace shall be contemporaneously documented. The ADOC shall summarize and analyze such data and remedy any space deficiencies identified through such an internal audit. The ADOC shall develop and implement a written policy to provide for identification of special needs women, including but not limited to women who are emotionally disturbed or suspected of being mentally ill, the mentally retarded, and those who pose high risk or require protective custody. Such a policy shall include and encourage multiple avenues of identifying such special needs women, permitting security staff, other prisoners, medical and other non-custodial staff, and others to make appropriate referrals. The identification of special needs women shall not be limited to the moment of intake.

## IV. ENFORCEMENT AND DISMISSAL.

**25. Reporting.** Defendants shall provide to Plaintiffs' counsel monthly reports on average daily population and progress in construction of a residential treatment unit for the first 2 years of this Agreement. If the population at the main Tutwiler building remains at 700 or below, and the annex at 250 or below, Defendants may thereafter make quarterly reports. Upon inquiry, plaintiffs' counsel shall be provided the population count on any day.

**26. Monitoring.** Plaintiffs' counsel shall have reasonable access to prison records and the prison facility, including escorted walk-through visits of the prison facilities on a quarterly basis during the first year following the entry of this Agreement, and twice a year thereafter. Paralegals working directly with Plaintiffs' counsel shall have reasonable access to inmates and will be accompanied by an attorney during any walk-through of the prison. Plaintiffs may bring experts at their own expense on such walk-through visits.

**27. Notice.** The Commissioner of the ADOC and his representatives shall provide a copy of or explain the terms of this Agreement to all of their agents, representatives, and employees in any way connected with the custody of class members, in order to ensure their understanding of the scope and substance of this agreement. Women entering Tutwiler shall be provided an information sheet, mutually approved by all parties, informing them of the existence and material terms of this Agreement. In addition, at least 3 copies of this entire Agreement shall be maintained in the Tutwiler library.

**28. Enforcement.** If the ADOC, its agents or contractors, fail to comply with the terms and conditions of this Agreement, Plaintiffs' counsel may apply to the Court for a finding of contempt or other appropriate relief. Prior to approaching the Court for such relief, Plaintiffs' counsel will bring, in writing, any deficiencies to the attention of the Defendants and will make reasonable attempts to resolve the issues informally. Issues that cannot be resolved informally between the parties shall be brought to the attention of the

Magistrate Judge, who will attempt to mediate a resolution, before Plaintiffs' counsel will move the Court for an Order for Defendants to show cause why they should not be held in contempt.

**29. PLRA findings.** The parties agree, and the Court hereby finds at this time, and after an independent review, that the prospective relief set forth in this Agreement is narrowly drawn, extends no further than necessary to correct the violations of federal rights set forth in paragraphs 69–100 and 142–171 in Plaintiffs' Second Amended Complaint, and is the least intrusive means necessary to correct these violations. The parties agree, and the Court hereby finds after an independent review, that this Agreement will not have an adverse impact on public safety or the operation of the criminal justice system. Accordingly, the parties agree, and the Court hereby finds, that this Agreement complies in all respects with the provisions of 18 U.S.C. § 3626(a). This Agreement is not intended to operate as a population cap or a prisoner release order. This Agreement is not intended to have any preclusive effect except as between the parties in this action. Should the issue of the preclusive effect of this Agreement be raised in any proceeding other than this action, the parties agree to certify that this Agreement was intended to have no such preclusive effect. This Agreement does not resolve, adjudicate, or bar the damages claims of any former, present, or future class members.

**30. Narrowly drawn relief.** For the purpose of ensuring that ongoing relief remains a narrowly drawn remedy, paragraphs 14, 19, and 23 of this Agreement shall be suspended when the population at the main Tutwiler facility is maintained at 700 or below and the population at the Tutwiler annex is maintained at less than 250 for 60 or more continuous days. Paragraphs 14, 19, and 23 shall not take effect until November 1, 2004, or until such time as the population at the main Tutwiler facility is maintained at 700 or below and the population at the Tutwiler annex is maintained at less than 250 for 60 or more continuous days. So long as the population at the main Tutwiler facility remains at 700 or below and the population at the Tutwiler annex is maintained at less than 250, paragraphs 14, 19, and 23 shall remain suspended and without force or effect. Should the population at the main Tutwiler facility thereafter increase to more than 700 or the population at the Tutwiler annex increase to 250 or more for 15 or more days in any 30 day period, all paragraphs of this Agreement shall return to full force and effect.

**31. Attorneys fees.** In the event the parties are unable to hereafter resolve by agreement issues relating to Plaintiffs' claim for attorneys' fees, Plaintiffs may petition the Court within thirty days of the date on which the Court enters its Order granting the parties' *Joint Motion to Adopt Settlement Agreement,* for a resolution thereof.

**32. Class members.** Parties stipulate to the certification of the class of all women who are now or will in the future be incarcerated in an Alabama Department of Corrections facility.

**33. Modification.** Any party may seek modification of any part of this Agreement for good cause shown. Construction of a new prison for women constitutes good cause for modification. The ADOC shall continue to implement in a timely manner all parts of this Agreement pending decision of the Court on any motion for modification.

**34. Term of Agreement.** This agreement shall be in effect for four years from the date the Agreement is approved by the Court. Nothing in this Agreement is in-

tended to preclude Defendants from moving to terminate the Order in the manner permitted by the Prison Litigation Reform Act.

## APPENDIX B

### *MEDICAL SETTLEMENT AGREEMENT*

#### I. INTRODUCTION

**A. Plaintiffs.** Plaintiffs in this class action are all women who are now or will in the future be incarcerated in an Alabama Department of Corrections facility. This action was filed seeking declaratory and injunctive relief for violations of their Eighth and Fourteenth Amendment rights. In their complaint, Plaintiffs allege that women with serious medical needs[1] receive constitutionally inadequate medical care.

**B. Defendants.** Defendants in this case are Donal Campbell, Commissioner of the Alabama Department of Corrections ("ADOC"); Bob Riley, Governor of Alabama; Gladys Deese, warden of Julia Tutwiler Prison for Women; and Mary Carter, warden of Birmingham Work Release. All Defendants are sued in their official capacity. The Plaintiff class and all Defendants are parties to this *Final Medical Settlement Agreement "Medical Agreement"*. The term "Defendants" refers to all these Defendants and their successors, agents, and assigns.

**C. Scope.** This *Medical Settlement Agreement* is submitted and entered into as a settlement of claims for declaratory and injunctive relief regarding medical care as set forth in paragraphs 101–162, 168–171, and 180 in Plaintiffs' *Second Amended Complaint*, filed on December 18, 2002. The United State District Court

for the Middle District of Alabama shall retain jurisdiction to enforce the terms of this *Medical Settlement Agreement* and shall preside over any further proceedings, as necessary. The parties hereby agree to the following terms.

#### II. ACCESS TO CARE

**A. Necessary medical services.** Women incarcerated in an ADOC facility are entitled to all medically necessary services in a timely manner. Medical necessity includes control of pain, prevention of disease, prevention of deterioration of function, and reduction of mortality.

**B. Daily sick call.** Sick call will be available every week day, excluding medical contractor holidays, to prisoners in all areas of the population at all women's facilities, including general population, segregation units or "lock-up cells", isolation units, and special management units. Within 24 hours of being placed in a lockbox, sick-call slips will be reviewed by a nurse, or higher level practitioner according to appropriate written triage protocols. At least one primary care physician (or psychiatrist, for mental health triage) must be involved in developing these protocols and in reviewing and updating them at least every two years. Each physician involved in this process shall sign and date the protocols (including each update) upon his or her review and approval.

A prisoner requesting medical care shall be seen by a nurse trained in physical assessment (and supervised by a Registered Nurse) or a higher level practitioner within 48 hours after her request has been received by health care staff. Any prisoner who is seen by a nurse two consecutive times for the same symptoms will be referred to a higher level

---

1. For purposes of this Settlement Agreement, "medical" shall refer to physical, mental and dental health care and treatment.

practitioner. This does not *require* two sick calls before a patient can be referred to a higher level practitioner; a registered nurse may make such a referral after a single sick call in accordance with appropriate triage protocols. Prisoners presenting symptoms requiring emergency or infirmary care shall be given immediate medical care. Sick call shall not be conducted between midnight and 6:00 a.m.

**C. Access to medical care at work release programs.** Women housed in ADOC work release programs shall be provided necessary and timely medical care, including care for chronic conditions, as described in this *Agreement.* Women housed in work release may affirmatively opt out and seek medical care from providers other than the ADOC if the prisoner pays for this care herself.

**D. Segregation.** Medical staff shall be notified promptly when a prisoner is placed in any type of isolation or segregation cell. If a woman is placed in the "lock-up" cell in Birmingham Work Release at a time when no medical staff are on site, medical staff shall be notified of the placement as soon as medical staff return to Birmingham Work Release Center. Upon notification, medical staff shall review the prisoner's medical record to determine whether her existing medical needs make placement in such a cell inappropriate or require that the prisoner receive extra observation, accommodation, or medical attention during her placement in the cell. Medical staff shall document their review and recommendations in the prisoner's medical record and promptly forward a copy to the supervising correctional officer for appropriate action. Prisoners placed in an isolation or segregation cell at Tutwiler Prison must be monitored daily by health care staff. Women placed in the "lock-up" cell in Birmingham Work

Release shall have access to a working intercom system, or shall be monitored by video. Security staff shall conduct visual inspections of the "lock-up" cell at least every 30 minutes, and shall notify medical staff promptly if they suspect that a prisoner in the cell is experiencing a medical problem. Medical monitoring activities must be documented in each prisoner's medical record.

### III. INTAKE

**A. Intake.** All prisoners entering Tutwiler Prison will be medically screened by a nurse or higher level practitioner within 12 hours of admission. The results of this screening shall be documented in each prisoner's medical record. The minimum components of the screening shall include, but shall not be limited to, the following: documented inquiry into current illness, communicable diseases, symptoms of tuberculosis, alcohol/chemical use/abuse history, allergies, current medications, dental status and screening, mental health problems, obstetrical history, current or past mental health treatment, and chronic health problems; observation of state of consciousness, mental status, appearance, conduct, bodily deformities and ease of movement, signs of trauma, signs of rashes and infections; documented explanation of the procedures for access to medical, mental health and dental services. In addition to explaining the procedures for accessing care, ADOC representatives shall provide all prisoners at intake a written description these procedures that the prisoners may keep. A suicide risk assessment using nationally accepted tools shall be conducted at the initial intake screening. Prisoners who are determined to pose a suicide risk at intake or at any other time during their incarceration shall be referred immediately to a qualified mental health provider for further assessment and treat-

ment and shall be placed under an appropriate watch to prevent suicide.

**B. Tuberculosis testing.** Tuberculin skin test screening shall be performed in accordance with Alabama Department of Public Health regulations and policies, and said test shall be read by a qualified medical provider within 48–72 hours of administration.

**C. Initial Physical Exam.** The first physical examination must be completed by a physician, physician assistance or nurse practitioner within seven days of intake. For all women, the initial physical exam shall include a pap test, cervical screening for chlamydia and gonorrhea, serum testing for syphilis, and urine screening for pregnancy. Where possible, the intake history and physical exam should be performed by the same individual.

## IV. CONTINUITY OF CARE

**A. Continuity of care.** To ensure continuity of care and prevent lapses in medication, the ADOC, through its agents or contractors, shall develop a written policy and implement a procedure that will ensure that upon admission to Tutwiler Prison, there is no disruption in the continuity of medication for persons with a chronic or acute illness. If a woman can identify her medication at intake at Tutwiler, then the medication shall be continued if the prescription for such medication can be verified by a physician or pharmacist. Where such verification is not obtained within 24 hours of intake, the woman must be seen by a physician or physician's assistant within 48 hours of admission who will prescribe necessary medication. Continuity and availability of medication and treatment will be maintained when prisoners are transferred between ADOC facilities, between ADOC and hospital facilities, or between ADOC and local detention cen-

ters. The ADOC is not responsible for medical care provided at local detention centers.

**B. Discharge planning.** For women who are in need of further medical care after discharge from the facility, the ADOC, through its agents and contractors, shall develop and implement a program for discharge planning that includes scheduled follow-up appointments and appropriate referrals to community medical and mental health services. Prisoners on prescribed medication shall be given at least a 10–day supply of their medication upon discharge. For prisoners on medication for serious mental illnesses as defined by ADOC Administrative Regulation 455, the ADOC, through its agents and contractors, shall make best efforts to secure an appointment with the community mental health provider for within 10 days of the prisoner's release. If an appropriate appointment cannot be made for within 10 days of the prisoner's release, the prisoner shall be provided an additional 20 days of her prescribed medication, so long as the prisoner signs a written acknowledgement that the packages containing their medications are not child proof. Prisoners taking HIV medications shall be given at least a 30–day supply of medication on release of HIV medications.

The ADOC, or its agents and contractors, shall collaborate with the local office of the Social Security Administration (SSA) to identify and assist prisoners who may be eligible for federal benefits upon release. Collaboration shall include (1) inviting SSA representatives to provide on-site training regarding their pre-release program, (2) notifying prisoners of the pre-release program (including eligibility requirements) and coordinating with volunteers to help women complete applications, (3) identifying po-

tential pre-release applicants and notifying the local SSA office the names, social security numbers, dates of birth, and anticipated discharge date of these women, and (4) providing relevant medical records.

## V. MEDICAL SERVICES

**A. Periodic health assessments and examinations.** The ADOC, through its agents or contractors, shall provide periodic health assessments for women prisoners in accordance with NCCHC standards and protocols promulgated by nationally recognized professional organizations. Women prisoners shall receive annual pap smears unless more frequent pap smears are medically ordered. Women prisoners shall also receive periodic mammograms as recommended by the American Cancer Society. Prisoners with abnormal pap smears or mammograms will be informed about the results of their tests and receive appropriate and timely follow-up testing and treatment based on recommendations of the American Cancer Society or ACOG. Women prisoners shall receive a tuberculin skin test annually or more frequently if exposure to tuberculosis is suspected.

**B. Emergency medical services.** Emergency medical services, including emergency transport service to community hospitals, will be available twenty-four hours a day, seven days a week through an on-call physician service and/or on-site health care staff.

**C. Dental services.** All dentists must be currently licensed. Women requiring treatment for relief of acute oral and maxillofacial conditions characterized by trauma, infection, pain, swelling or bleeding which are likely to remain acute or worsen without intervention, must be provided appropriate dental care (including effective infection and pain control) promptly. Women requiring treatment for the control of extensive subacute dental or oral pathology, must be provided dental care within 30 days. This care shall not be limited to extractions or temporary fillings, but also includes restoring carious teeth, extractions, long-term management of peridontal disease, and endontic and prosthodontic procedures needed to retain or restore essential masticatory function. Women requiring ongoing treatment for chronic dental or oral pathology and for the restoration of essential function must be seen within 60 days. For women who are prescribed dental prosthetics such as dentures, impressions for such prosthetics shall be made as soon as it is medically appropriate to make such impressions. The dental prosthetic shall be available within 60 days of impression. All prisoners will have the opportunity to have their teeth cleaned at least once every 24 months. Individuals at risk of peridontal diseases because of age, tobacco use, rate of accumulation of deposits, medication, or medical conditions such as diabetes or HIV infection, may need to be cleaned more often, in accordance with the standard of care for their conditions.

**D. Infection control.** An infection control program that includes airborne and blood-borne pathogen control plans conforming to Centers for Disease Control ("CDC") regulations, guidelines and recommendations shall be developed and implemented. The program must include appropriate training for correctional and health care staff consistent with these recommendations and guidelines. The airborne and bloodborne pathogen plans must be reviewed and updated every two years or sooner if appropriate.

**E. Tuberculosis prevention and treatment.** The ADOC, through its agents or contractors, shall promptly diagnose, and treat any individual with a reasonable suspicion of contagious tuberculosis as direct-

ed by the Alabama Department of Public Health. Any individual who reports or exhibits symptoms of tuberculosis, including HIV-positive persons, shall be isolated immediately in a properly functioning negative pressure room and have a chest x-ray as soon as possible but in no event later than 96 hours from the reporting of the symptoms. Follow-up treatment and testing shall be conducted according to the recommendations and guidelines of the CDC. Persons with a positive tuberculin skin test result shall be provided a chest x-ray as soon as possible but in no event later than 96 hours of identification of the positive skin test result. Prisoners with chest x-rays that show possible active tuberculosis infection will receive prompt follow-up evaluation and treatment and will be placed in respiratory isolation until active tuberculosis has been ruled out. Preventive treatment for tuberculosis shall be offered to any prisoner with a positive PPD skin test whose anticipated length of stay is greater than two months. Prisoners who receive positive skin tests or suspicious chest x-rays will be counseled about the meaning of these test results. In the event that an active case of TB is identified in the facility, an appropriate contact investigation as directed by the Alabama Department of Public Health will be conducted and all potentially exposed individuals will be provided detailed and thorough educational materials about tuberculosis infection. The Alabama Department of Corrections shall maintain appropriate facilities and/or make appropriate referral outside prison facility for respiratory isolation that are consistent with the recommendations of the CDC.

**F. Chronic illnesses.** The ADOC, through its agents or contractors, shall implement policies and procedures to ensure that the overall standard of care for women with serious chronic medical conditions is consistent with clinical guidelines adopted by the NCCHC as detailed in the *Standards for Health Services in Prisons* and the current clinical guidelines posted on their web-site. For chronic conditions where NCCHC clinical guidelines are not yet available, the ADOC through its agents and contractors, shall provide treatment consistent with nationally accepted clinical guidelines.

For each individual identified with a chronic illness requiring ongoing medical care, a health care treatment plan shall be developed that includes, at a minimum, the following: a written initial evaluation containing short and long range treatment goals by a licensed physician; regular check-ups at least once every 3 months by the chronic care director or higher level practitioner, unless a different period is ordered by a physician; and baseline and quarterly laboratory work and other diagnostics appropriate for the disease. The treatment plan's short and long range goals must be reviewed and updated at least annually in a face-to-face assessment by the attending physician or more frequently as determined by the physician or chronic care director. For patients requiring chronic care, co-payments shall not be assessed for regularly scheduled chronic care clinics.

**G. Hepatitis A, B, and C.** The ADOC, through its agents and contractors, shall make best efforts to secure grant money to ensure that women are counseled, evaluated and vaccinated for hepatitis A and B by October 2005. All women prisoners who are HIV-positive will be vaccinated for hepatitis B.

**H. Prosthesis.** Women requiring a prosthesis will be fitted for such a device within 60 days of prescription. If a prosthesis no longer fits a prisoner, she will be

re-fitted for a revised or new prosthesis within 90 days. Prisoners requiring a prosthesis shall be considered chronic care patients for the period necessary to adjust a new, replacement, or refitted prosthesis, and women will receive follow-up care during this adjustment period as medically ordered.

**I. Women's health care.** Women prisoners must be provided treatment for osteoporosis, menstrual abnormalities, ovarian and cervical abnormalities and menopause in accordance with the guidelines of the American College of Obstetricians and Gynecologists. Preventive screening shall be provided in accordance with the American Cancer Society.

**J. Pregnancy.** Pregnant prisoners shall be monitored regularly by a medical doctor or physician assistant with obstetric specialty, in accordance with American College of Obstetrics and Gynecology ("ACOG") guidelines for prenatal care. Pregnant women shall be provided an appropriate diet and supplemental vitamins, and given the opportunity to request and receive educational information regarding pregnancy. Gestational diabetics shall be treated according to ACOG guidelines. All high-risk pregnancies, as well as women near term, shall be closely monitored and treated. Upon return from the hospital post-delivery, women prisoners will be allowed appropriate bed rest and time for recovery.

**K. Specialty care.** Patients requiring necessary medical services that cannot be provided in the facility in a timely manner shall be provided timely access to an outside specialist for diagnostic services or medical care. Where approval by the state medical director is required for specialty care, such approval or denial shall be documented. The ADOC, through its agents and contractors, shall make best efforts to ensure that the outside special-

ist's diagnoses and test results in addition to the specialist's orders for further testing, treatment and diagnostic services are documented in the patient's prison medical record. Orders shall be carried out in the manner prescribed by the specialist, unless a deviation or override is ordered by the attending physician at the facility. Such a deviation or override must be affirmatively medically justified and documented in the medical record of the prisoner. Necessary off-site care shall include follow-care and monitoring prescribed by the off-site specialist.

**L. End of life care and care for the elderly.** Elderly patients and those in the terminal stages of a disease shall be provided appropriate care and treatment, including pain control, adequate nutrition, accommodations for mental and physical deterioration, and other appropriate palliative care.

**M. Patient education.** Patient education shall include one-on-one counseling by medical staff at the time care is provided. The ADOC medical provider shall inform patients of the results of any medical tests and assessments within 10 days of receipt of these results in a manner that protects the privacy of the patient, and shall provide appropriate post-test counseling. Prisoners shall not be charged a co-pay for receiving this information. The ADOC, through its agents and contractors, shall also implement a program to make available to patients up-to-date written information in the areas of infectious and communicable disease, and chronic illnesses. Clinical staff knowledgeable about HIV/AIDS shall provide HIV education for all new prisoners. Prisoners who are HIV-positive shall be provided on-going education and confidential counseling about HIV. This education and counseling may be provided in a structured peer education and support program. The ADOC

and its medical provider shall cooperate with health organizations, or community organizations working in conjunction with health organizations, to provide prisoners educational materials and services regarding medical conditions, treatment, and related social services.

**N. HIV/AIDS.** Prisoners who learn they are HIV+ in prison shall be informed of their test results and receive appropriate post-test counseling in a confidential setting. Treatment of HIV/AIDS shall be consistent with Department of Health and Human Services guidelines and recommendations.

**O. Staphylococcus aureus.** The Alabama Department of Corrections, through its agents and contractors, shall continue to develop and implement a program based on FBOP guidelines to treat and to minimize the spread of staphylococcus aureus, including methicillin-resistant staphylococcus aureus (MRSA), and shall work with the Correctional Healthcare Monitor to continually update and improve this program.

**P. Therapeutic medical diets.** Diabetics, as well as patients requiring low salt, renal, low cholesterol, high calorie, or other special diet, shall be provided a medically appropriate diet as approved by a registered dietician. Special medical diets may be ordered by mid– or higher-level medical providers.

**Q. Mental health care.** Defendants' mental health consultant Jane Haddad has conducted on-site audits and reviews of the women's prison facilities to determine mental health housing and treatment space needs, as well as training, programming, reporting, treatment, and staffing needs. Defendants have implemented and shall continue to implement all of Dr. Haddad's recommendations as set forth in her report of her January 15–16, 2004, audit. Within 6 months of final approval of this *Agree-*

*ment,* Defendants shall begin renovations of Dormitory 2 at Tutwiler Prison to provide for a group room, dayroom, two offices spaces, and a reduction of beds to no more than forty beds. Defendants further agree to use their best efforts to add a nursing station, and six single cells for crisis intervention and intensive psychiatric stabilization, within 3 years of final approval of this *Agreement.* Until these renovations are completed, the ADOC, through its agents and contractors, may but shall not be required to provide 24/7 mental health nursing coverage in the mental health unit. Until these renovations are completed, the ADOC, through its agents and contractors, shall work with Dr. Haddad to determine and implement the measures necessary to ensure that individuals needing intensive psychiatric stabilization and residential treatment levels of treatment receive adequate mental health care.

**R. Mental health auditor.** Dr. Haddad, or another mental health consultant mutually agreed upon by the parties, shall continue in her current capacity as Defendants' mental health consultant, with on-site inspections at least 3 times a year, for the duration of this *Agreement* or 3 months past the date the Residential Treatment Unit becomes fully operational, whichever period is shorter. The mental health consultant shall be paid by the Defendants and be reimbursed for reasonable expenses for the first 2 years, and by counsel for Plaintiffs for the remainder for her tenure. If Dr. Haddad is no longer able to act as mental health consultant, and parties are unable to agree on a mental health consultant within 30 days of her departure, parties will each submit to the Magistrate Judge the names of three suggested consultants, and the Magistrate Judge will select the mental health consultant.

**S. Chronic Mental Illnesses.** The ADOC, through its agents and contractors, shall implement policies and procedures to ensure that the overall standard of care of women with serious chronic mental health conditions is consistent with clinical guidelines adopted by the American Psychiatric Association.

**T. Suicide Prevention and Treatment Program.** ADOC, its agents, and contractors, shall continue to implement an effective and comprehensive suicide prevention and treatment program.

**U. Self–Injurious Behavior.** Prisoners who engage in self-injurious behavior must receive appropriate and timely mental health intervention including treatment and counseling. Such a prisoner shall also be evaluated by a qualified mental health professional. Only if that professional determines that the behavior was engaged in solely for the purpose of secondary gain may disciplinary action be considered.

**V. Crisis Intervention and Follow–Up Care.** Together with the mental health auditor, Defendants will write and implement policies and procedures to ensure that mental health crises and urgent requests for mental health intervention are addressed by qualified mental health staff immediately. Following a mental health crisis such as a psychotic episode or suicide attempt, prisoners shall receive appropriate treatment, counseling, and observation as ordered by the treating psychiatrist.

**W. Depression and Abuse.** Counseling must be available to women prisoners to address depression and to resolve issues associated with victimization from sexual and physical abuse.

**X. Vulnerable Populations.** The ADOC, working with its mental health provider, shall develop and implement a policy to protect vulnerable prisoners (particularly mentally ill and/or mentally retarded women) from intimidation, harassment, and abuse.

## VI. STAFFING

**A. General.** ADOC, through its agents and contractors, shall create and fill a sufficient number of qualified permanent medical, nursing, and ancillary health care staff positions (i.e. medical records clerks, lab tech, etc.) to carry out all aspects of this *Medical Settlement Agreement.*

**B. Licensure and credentials.** ADOC, through its agents and contractors, shall make best efforts to hire primary care physicians who hold a current valid, unrestricted license to practice medicine in Alabama. In the event Defendants cannot find a primary care physician with an unrestricted license, Defendants will seek approval of a Magistrate Judge to hire a physician with a restricted license in order to avoid a lapse in medical coverage. Such a hire shall be temporary, though Defendants may seek re-approval of a Magistrate Judge in extraordinary circumstances. Parties consent to the jurisdiction of a Magistrate Judge, and Plaintiffs will not seek fees, for disposition of this issue.

Nurses must hold current applicable licenses. All other ancillary personnel must meet applicable state regulatory requirements and training standards. Personnel working under a license or certification who are subject to restrictions or conditions imposed by the licensing agency, or who have formal complaints filed against them, must immediately report such restrictions, conditions, or complaints to the Medical Director. Nurses shall not make nursing assessments or decisions outside the scope of their license and training.

**C. Orientation and training.** Medical and nursing staff must be currently certi-

fied in cardiopulmonary resuscitation ("CPR"). All medical and nursing staff who provide sick call shall receive regular training to maintain competence in current methods for diagnosing and treating medical complications associated with acute and chronic illness, including the ability to recognize when referral to a physician, mental health provider, or specialist is necessary. Medical and nursing staff shall also be trained to recognize the signs and symptoms of mental illness, including potential suicide risk and how to react appropriately to such symptoms and risks. All medical and nursing staff shall be provided a copy of this *Agreement*.

**D. Security staff.** All correctional security staff shall receive regular training regarding HIV, hepatitis and tuberculosis infection, including modes of transmission and universal precautions. All security staff shall have current training in CPR and in Basic First Aid. Security staff shall also be trained to recognize the signs and symptoms of mental illness, including potential suicide risk and how to react appropriately to such symptoms and risks. Security staff will not interfere with the provision of necessary medical care. Security staff shall follow medically ordered restrictions on inmate activity such as bedrest, lifting or work restrictions, bunk profiles and needs for special shoes or clothing.

## VII. PHARMACEUTICALS

**A. Formulary.** The drug formulary must contain modern pharmaceuticals for diagnoses prevalent in the correctional setting, updated at least every 6 months by a team of providers that includes a primary care physician and psychiatrist. The formulary must include drugs in the following classes, among others: (1) atypical antipsychotics, (2) proton pump inhibitors, (3) angiotensin receptor blockers, (4) selective serotonin reuptake inhibitors, (5) statins, and (6) antiretrovirals.

**B. Off-formulary medications.** A formulary waiver process that does not inhibit the timely delivery of medications prescribed for medically necessary conditions shall be implemented.

**C. Administration.** The ADOC, through its agents and contractors, shall develop and implement a system to provide medications in a timely manner and to track and correct problems with the dispensing and administration of medications. Medication normally stocked in the pharmacy must be made available for the administration of the first dose within 24 hours of intake, and within 24 hours of prescription by the physician. Other medications must be available within 48 hours of prescription. Medication shall be administered at times and in a manner (with food, for example) consistent with prescribing guidelines defined by the Food and Drug Administration or as prescribed by a physician. Prisoners refusing medication must be provided counseling regarding the consequences of incomplete adherence; both the refusal and the counseling must be documented and in-person. Nothing in this paragraph precludes the forced administration of medication, so long as such forced medication is administered according to current written policy. If medication is not administered to a prisoner, the reason must be documented and signed by the health care staff responsible for medication administration. Correctional staff shall not administer dose by dose medication to prisoners, except at Birmingham Work Release.

There must be general pill call at least three times a day. Management of pharmaceuticals must be in accordance with state and federal law.

**D. Keep on person medications.** The ADOC, through its agents and contractors,

 

shall develop and implement reasonable criteria, policies, and procedures for prisoners to be issued appropriate medications to keep on their persons.

**E. Continuity of medication.** The ADOC, through its agents and contractors, shall develop and implement written protocols designed to ensure that there are no lapses in medication.

## VIII. RECORDS AND REPORTS

**A. Prisoner health care records.** Medical care, including dental and mental health treatment, provided to prisoners shall be accurately documented in each prisoner's medical record. Medical records and health record policies and procedures shall comply with current NCCHC Standards. The records must include all reports received from outside hospitals and emergency rooms, current treatment plans, requests for medical attention, and responses by medical staff. Individual medical records shall be maintained on a current basis, with no more than a 7–day lag for filing new paperwork (except for current MAR's, which must be promptly filed at the end of each month). Patients' health care records shall be available to and used by all healthcare workers in each clinical encounter with the patient.

**B. Prison health care logs.** The ADOC, through its agents and contractors, shall maintain current and ongoing logs tracking health care requests, all clinical encounters, complaints, grievances, and chronic care clinics, conforming with NCCHC Standards.

## IX. PHYSICAL PLANT

**A. Infirmary.** The quality improvement committee (see below) shall review the capacity of the Tutwiler infirmary (including the "green rooms" or "psychiatric stabilization units") and provide written guidelines as to types of services appropriate for infirmary care. The infirmary unit shall conform with NCCHC standards including the requirement that all infirmary patients must be within sight or sound of nursing or medical staff at all times. Physician rounds shall be conducted 5 days a week, and an RN or higher level medical provider shall be present at the infirmary each day.

**B. Medical isolation.** Negative pressure in the medical isolation unit shall be documented daily when in use and monthly when not in use. If there is not a working room or not enough rooms at the prison facility, the ADOC shall make appropriate referral outside prison facility for respiratory isolation.

**C. Heat and shade.** Defendants shall develop and implement a heat plan that includes policies and procedures ensuring sufficient means of cooling and hydration for heat-sensitive individuals to prevent dehydration, heat exhaustion, heat stroke, and other adverse consequences of heat.

**D. Sanitation.** All areas housing or temporarily holding prisoners with illnesses, or where prisoners receive medical care or testing, shall be thoroughly cleaned on at least a daily basis or more often if necessary, shall be disinfected between placements, and shall be kept in good physical condition.

**E. Medical examination rooms.** An adequate number of clinical examination rooms shall be provided, containing an examination table and hand washing facilities to ensure private examinations.

**F. Equipment.** The ADOC shall provide at Tutwiler prison appropriate and operative equipment, such as automatic defibrillators, to respond to medical emergencies. Staff shall be properly trained to use such equipment. If dialysis is conducted on-site, staff shall be trained in proper methods, and appropriate equip-

ment and space shall be available to perform dialysis. Prisoners who enter prison with respiratory or other medical equipment that is necessary to enable their functioning shall be allowed to use their own equipment or shall be provided appropriate equipment. The ADOC shall ensure that any such equipment receives necessary and timely servicing and replacement. Each facility shall also have a sufficient number of wheelchairs and handicap-accessible bathroom facilities (including toilets, sinks and showers).

## X. QUALITY ASSURANCE

**A. Ongoing quality management.** A quality management program consistent with nationally accepted standards shall be implemented. A monthly administrative committee shall meet to review audits designed to improve quality of health care. A quality improvement committee that includes a representative of the correctional staff will perform at least quarterly reviews of major components of healthcare at each women's facility, including at least the following: access to healthcare, medication management, nursing services, physician services, access to specialty care, mental health services, pharmacy services, dental services, subcontractor services, infection control procedures, healthcare records, sick call services, intake screening and evaluations, chronic disease services, infirmary care, diagnostic services, discharge planning, and adverse patient occurrences including all deaths. The quality management program must review each of these areas, identify any deficiencies in services to prisoners as well as any staff training needs, and produce corrective plans to address the deficiencies and recommend improvements.

Performance in these areas shall be quantified on a quarterly basis, trended, and analyzed for opportunities for im-

provement. Remedies shall be implemented expeditiously, followed by remeasurement to assess the results of the interventions. The quality management program shall include ongoing assessment of the effectiveness of corrective plans and actions. The staffing of the women's facilities shall be reviewed by Defendants at least every six months and adjustments made to ensure adequate staffing at all times.

**B. Mortality reviews.** A mortality review of all deaths must be completed within 30 days of each death. The review is to be conducted by a team that includes an independent physician (one who is not the primary care provider at the institution where the death occurred). This review shall consider any and all aspects of custody and health care that may have contributed to the death. The results of this review shall be documented and used to develop interventions to prevent future adverse consequences.

**C. Correctional Healthcare Monitor.** Parties have agreed on Dr. Michael Puissis as the Correctional Healthcare Monitor ("Monitor") to monitor compliance with this *Medical Settlement Agreement*. The Healthcare Monitor shall be a neutral monitor responsible to the Court. The Monitor shall be paid by the Defendants and be reimbursed for reasonable expenses to a maximum amount agreed to by counsel for parties. The Monitor shall have access to women prisoners and their medical records, to members of the medical and security staff, and to any other information or documents he or she deems necessary to determine compliance with this *Medical Settlement Agreement*. The Monitor shall conduct an initial assessment within 60 days of the Court's approval of this *Medical Settlement Agreement* and make written recommendations regarding deficiencies that prevent compliance with

this *Agreement*. The Monitor shall make quarterly on-site inspections of Tutwiler and BWR per year. If the ADOC, its contractors and agents are determined to be in substantial compliance of the *Agreement* for three consecutive inspections in the second year, the Monitor shall make only two on-site inspections per year for the remainder of the *Agreement*. The Monitor may bring additional medical experts as needed to properly evaluate the health services provided to Plaintiffs. The Monitor shall prepare audit reports following each inspection, and items for improvement shall be addressed in a subsequent corrective plan by the institution's quality improvement committee. The Monitor shall provide copies of his or her reports to the Court, Defendants', and Plaintiffs' counsel.

## XI. IMPLEMENTATION AND ENFORCEMENT

**A. Notice.** The Commissioner of the ADOC and his representatives shall provide a copy of or explain the terms of this *Medical Settlement Agreement* to all of their agents, representatives, and employees in any way connected with medical care of class members, in order to ensure their understanding of the scope and substance of this *Agreement*. Women entering Tutwiler shall be provided an information sheet, mutually approved by all parties, informing them of the existence and material terms of this *Medical Settlement Agreement*. In addition, at least 3 copies of this entire *Medical Settlement Agreement* shall be maintained in the Tutwiler library.

**B. Enforcement.** If the ADOC, its agents or contractors, fail to comply with the terms and conditions of this *Medical Settlement Agreement*, Plaintiffs' counsel may apply to the Court for a finding of contempt or other appropriate relief. Pri-

or to approaching the Court for such relief, Plaintiffs' counsel will bring, in writing, any deficiencies to the attention of the Defendants and the Healthcare Monitor or Mental Health Auditor, as appropriate, and will make reasonable attempts to resolve the issues informally. Issues that cannot be resolved informally between the parties shall be brought to the attention of the Magistrate Judge, who will attempt to mediate a resolution, before Plaintiffs' counsel will move the Court for an Order for Defendants to show cause why they should not be held in contempt.

**C. PLRA findings.** The parties agree, and the Court hereby finds at this time, and an after independent review, that the prospective relief set forth in this *Medical Settlement Agreement* is narrowly drawn, extends no further than necessary to correct the violations of federal rights set forth in paragraphs 101–162, 168–171, and 180 in Plaintiffs' *Second Amended Complaint*, and is the least intrusive means necessary to correct these violations. The parties agree, and the Court after an independent review hereby finds after an independent review of the *Medical Settlement Agreement*, that this *Agreement* will not have an adverse impact on public safety or the operation of the criminal justice system. Accordingly, the parties agree, and the Court hereby finds, that this *Medical Settlement Agreement* complies in all respects with the provisions of 18 U.S.C. § 3626(a). This *Medical Settlement Agreement* is not intended to have any preclusive effect except as between the parties in this action. Should the issue of the preclusive effect of this *Medical Settlement Agreement* be raised in any proceeding other than this action, the parties agree to certify that this *Medical Settlement Agreement* was intended to have no such preclusive effect. This *Medical Settlement Agreement* does not resolve, adju-

dicate, or bar the damages claims of any former, present, or future class members.

**E. Attorneys fees.** In the event the parties are unable to hereafter resolve by agreement issues relating to Plaintiff's claim for attorneys' fees, Plaintiffs may petition the Court within thirty days of the date on which the Court enters its Order granting the parties' Joint Motion to Adopt Settlement Agreement, for a resolution thereof.

**F. Class members.** Parties stipulate to the certification of the class of all women who are now or will in the future be incarcerated in an Alabama Department of Corrections facility.

**G. Modification.** Any party may seek modification of any part of this *Medical Settlement Agreement* for good cause shown. The ADOC, through its agents and contractors, shall continue to implement in a timely manner all parts of this Agreement pending the decision of the Court on any motion for modification.

**H. Term of Agreement.** This *Medical Settlement Agreement* shall be in effect for four years from the date the Agreement is approved by the Court. Nothing in this *Agreement* is intended to preclude Defendants from moving to terminate the Order in the manner permitted by the Prison Litigation Reform Act.